JOURNAL ENTRY AND OPINION
{¶ 1} In this personal injury action resulting from a motor vehicle accident, plaintiff-appellant Alan Ryan appeals both from the ultimate jury verdict rendered in favor of defendant-appellee Daneen Koenig, and also from the earlier order of the trial court that granted summary judgment to defendant-appellee Valley Forge Insurance Company.
 {¶ 2} Appellant asserts the jury's unanimous verdict for Koenig on his personal injury claim against her was not in accord with the manifest weight of the evidence; therefore, the trial court improperly denied his motion for a new trial. Appellant further asserts the trial court denied him his right of confrontation by limiting his cross-examination of Koenig's medical expert. Finally, appellant asserts summary judgment for his employer's insurance company was inappropriate, since it was liable by operation of law for the damages he sustained in the accident.
 {¶ 3} This court, however, cannot agree with any of appellant's assertions. Consequently, his assignments of error are overruled, and the jury's verdict and the trial court's order of summary judgment are affirmed.
Appellant filed this action against Koenig and Valley Forge Insurance Company[1] in November 2001. Appellant claimed his involvement in a motor vehicle accident with Koenig had resulted in permanent injuries to his "left knee, neck, and left shoulder." Appellant additionally claimed he was entitled to underinsured motorist ("UIM") coverage for the injuries he suffered under his employer's commercial general liability insurance ("CGL") policy, which applied to the accident "by operation of law" pursuant to the Ohio Supreme Court's decision in Scott-Pontzer v.Liberty Mut. Fire Ins. Co., 85 Ohio St.3d 660, 1999-Ohio-292.
 {¶ 4} The accident had occurred on October 23, 1998. Appellant was driving his teenaged son to school, proceeding in his mid-sized automobile at the posted speed limit of 25 miles per hour westbound on Naumann Avenue in Euclid, Ohio. Appellee Koenig, who lived on the north side of that street, was backing her sport-utility vehicle out of her driveway. Although she stopped to observe traffic, she failed to notice appellant behind her before she continued her progress. Thus, Koenig's vehicle struck and scraped the passenger side of appellant's car as he traveled past.
 {¶ 5} Both vehicles immediately halted. Appellant and his son exited, and, seeing Koenig obviously was pregnant, approached her to ask if she were injured. Koenig assured them she was fine, and, in response to her inquiry, they in turn told her they had not been hurt. Appellant and his son repeated their declarations to Koenig's husband when he emerged from the house.
The police were summoned to the scene to make a report of the accident. Appellant's son, however, decided to walk to school so as not to miss his classes, thus lending support to appellant's information subsequently given to the police that neither he nor his son required any medical attention. Although appellant eventually drove his automobile away from the scene, he later discovered it had sustained damage to the passenger side that cost nearly $5000 to repair.
 {¶ 6} Approximately three weeks after the accident, appellant made an appointment to see his orthopedic physician, Dr. Donald Goodfellow. Appellant informed Goodfellow that he had been involved in a motor vehicle accident. He stated that his car was "struck from the side and his [left] knee twisted to the outside and he had a sharp pain running down the medial aspect of his knee intermittently ever since."[2] He complained that it felt more comfortable for him to walk with his left foot rotated outward.
 {¶ 7} The record reflects appellant had a long medical history with regard to his left knee prior to his November 19, 1999 consultation with Goodfellow. Appellant's extensive participation in high school and college sports had precipitated four surgeries on his left knee between 1963 and 1987. In 1987, appellant's left knee already had been noted by a physician to have "marked crepitus tri-compartmentally with range of motion." This indicated appellant's knee had undergone arthritic degeneration that caused an audible grinding noise in all three compartments of the joint when it moved.
 {¶ 8} Appellant first had sought treatment from Goodfellow for pain in his left knee in November 1988. Goodfellow at that time observed that appellant did not walk with any significant abnormality, but noted appellant exhibited "rather advanced" arthritis and crepitus. Goodfellow diagnosed appellant as having a "distal pull" of his patella, and prescribed pain and anti-inflammatory medications. He advised appellant to perform only a moderate exercise program designed to strengthen the quadriceps and hamstrings in his left leg.
 {¶ 9} Appellant sought treatment for his knee problems from Goodfellow several more times in the ensuing years. Goodfellow prescribed a Cortisone injection in January 1989. In June 1990, appellant, an automobile salesman, had "bumped" his knee into a car's bumper, causing a "flare-up" of his knee problem; therefore, Goodfellow prescribed another injection of Cortisone for him. In 1992, appellant reported to Goodfellow he had been in a motor vehicle accident in which he "hit his knee on the door handle or the dashboard, and this aggravated his knee again."
By this time, x-rays of appellant's left knee demonstrated it had developed "medial osteophytes," or "bone spurs," and further showed "significant degenerative change throughout the joint" had occurred. At a subsequent visit in 1995, when appellant complained of pain after jogging, Goodfellow noted that although appellant's knee joint contained no effusion and demonstrated a "fairly symmetric" range of motion, it "had a lot more crepitus." Goodfellow recommended that if appellant could not cease jogging entirely, he should limit himself to a type that was of low impact.
 {¶ 10} Appellant had continued also to see his family physician, Dr. Kent, during these years. In 1997, Kent also advised appellant to limit activities that placed additional stress on his knee. These activities included jogging and weight lifting. Appellant, however, enjoyed an active lifestyle. Despite these physicians' advice, appellant often aided his two teenaged children in training for high school athletic events by playing football and tennis, and jogging several miles at a time, typically uphill on an asphalt path. Appellant began to wear a knee brace that Goodfellow prescribed for him to ease his occasional pain.
 {¶ 11} At appellant's office visit that followed the accident with Koenig, Goodfellow did not notice either any fluid or any loss of motion in appellant's knee. Goodfellow determined appellant's brace had "worn out," so he prescribed another. Goodfellow also informed appellant that he eventually would require a "knee replacement;" appellant received no additional treatment.
Appellant's son thereafter failed to notice any significant change in his father's exercise regimen. Appellant did, however, seek some physical therapy treatments for pain in his neck and shoulder. Appellant did not attribute his need for the treatment to an involvement in a motor vehicle accident.
 {¶ 12} Appellant returned to Goodfellow on February 18, 1999. At this visit, appellant complained he still was experiencing a lot of pain in his knee. Goodfellow noted on the medical chart he observed no fluid in the joint, and no "mechanical symptoms," but a lot of "grinding." Goodfellow believed what appellant was experiencing "was all weight-bearing pain" which was "just due to his arthritis." He again suggested appellant would require knee replacement surgery.
 {¶ 13} That same day, appellant also sought treatment from orthopedic surgeon Dr. Robert Fumich. Appellant indicated he had been referred by his attorney, and without detail, indicated he had undergone four previous surgeries on his left knee. After complaining of "continued" neck and shoulder pain and an injury to his left knee following an October, 1998 motor vehicle accident, appellant described the "mechanism" of the injuries he had sustained. Fumich examined appellant and obtained x-rays.
During the examination, appellant seemed unable to fully either turn or bend his neck, but "his reflexes, strength and sensation were intact." His knee demonstrated no swelling, but "significant crepitation on flexion and extension." The x-rays showed arthritic change and decreased disc space in appellant's neck. Appellant's left knee demonstrated both a "varus deformity," i.e., an outward bowing, due to loss of the articular cartilage on the tibia, and also a loss of the medial joint space.
 {¶ 14} Fumich opined appellant's pain resulted from the accident and prescribed an arthritis medication. Warning appellant he would "eventually require a knee joint replacement," Fumich further advised appellant to wear a new knee brace, to continue physical therapy treatments, and to return in two weeks. For the future surgery, Fumich referred appellant to Dr. Yoel Anouchi, another orthopedic surgeon in the same office.
 {¶ 15} Appellant failed to return to Fumich in two weeks. Instead, he maintained his normal routine. Ten months later, in December 1999, after he and his son aided appellant's fiancee move to a new home, appellant reappeared in Goodfellow's office. Appellant told the doctor he had done "a lot of heavy lifting and carrying" and now suffered from back pain, numbness in his toes, and a burning sensation in his shin. Appellant also stated his knee functioned "well" as long as he wore his brace.
Appellant finally returned to Fumich on January 18, 2000. Although Fumich saw no need for any additional treatment of appellant's neck and shoulders, appellant by that time could no longer "function" without the knee surgery. Appellant, therefore, followed Fumich's earlier recommendation to see Anouchi; the medical records, however, do not reflect that appellant told his surgeon that his knee had been injured in an automobile accident.
 {¶ 16} Anouchi performed the total knee replacement surgical procedure in February, 2000. By the time the instant action was filed, appellant had been informed he would require additional knee surgeries as he grew older.
 {¶ 17} Appellant claimed in his complaint that the motor vehicle accident with Koenig had caused injuries to his neck, shoulder and knee. He further claimed that although Koenig's automobile insurer, Allstate Insurance Company, had issued a policy to her with liability limits of $100,000, that amount would be inadequate to compensate him for the injuries he had sustained.
 {¶ 18} On that basis, appellant added in the second count of his complaint a claim against his employer's insurer. Appellant had been employed by Glavic Motors, Inc. at the time of the accident. Citing the supreme court's decision in Scott-Pontzer, supra, appellant claimed the UIM coverage contained in the CGL policy Valley Forge had issued to Glavic applied "by operation of law" to fully compensate him for the injuries he had sustained.
 {¶ 19} Valley Forge filed a motion for summary judgment with respect to appellant's second count prior to trial. After considering the parties' briefs with respect to the issue, the trial court determined that unlike the policy examined in Scott-Pontzer, Glavic's CGL policy was not ambiguous.
In its opinion and order, the trial court found that the "Named Insured" endorsement in Glavic's policy removed any ambiguity concerning which individuals employed by the corporation were covered under its terms. Appellant's name was not listed; therefore, the policy did not apply to him. Consequently, appellee Valley Forge was entitled to summary judgment with respect to appellant's claim.
 {¶ 20} Trial subsequently proceeded against only Koenig. Koenig stipulated that she had been negligent; thus, the jury considered the issues of proximate cause and damages. The parties presented the testimony of appellant, his son, and Koenig; and, by videotape deposition, the testimony of appellant's treating physicians Goodfellow, Fumich, and Anouchi, and of Koenig's medical expert, Dr. Jeffrey Morris. Appellant also supplied documentary evidence of his medical conditions.
 {¶ 21} The jury ultimately returned a verdict in appellee Koenig's favor on appellant's claim against her. Upon the trial court's subsequent denial of appellant's motion for a new trial, appellant instituted this appeal. He presents the following three assignments of error:
 {¶ 22} "1. The trial court verdict (sic) is against the manifest weight of the evidence and the trial court erred by not granting appellant a new trial.
"2. The trial court erred by not permitting appellant to cross-examine appellee's medical expert on his insurance company bias.
 {¶ 23} "3. The trial court erred when it denied appellant's motion for summary judgment on the issue of insurance coverage and granted summary judgment in favor of appellee Valley Forge Ins. Co."
 {¶ 24} In his first assignment of error, appellant asserts the evidence does not support the jury's verdict. He contends the trial court therefore improperly denied his Civ.R. 59(A)(6) motion for a new trial. This court disagrees.
 {¶ 25} This court may reverse a trial court's decision to deny a motion for a new trial only upon a demonstration of an abuse of discretion such that a manifest injustice has occurred. Rohde v. Farmer
(1970), 23 Ohio St.2d 82, paragraph three of the syllabus. In weight of the evidence matters, the trial court's decision is given deference.Myers v. Garson, 66 Ohio St.3d 610, 1993-Ohio-9. Thus, if a verdict is supported by substantial competent, credible evidence, the trial court's decision to deny a Civ.R. 59(A)(6) motion for a new trial must be upheld. Verbon v. Pennese (1982), 7 Ohio App.3d 182.
In this case, appellant cannot demonstrate an abuse of discretion, because the record reflects the jury's verdict is well-supported. Contrary to the argument he puts forward in his appellate brief, the jury was not required to believe the opinions of appellant's medical experts.Rodrigues v. Wasman (Jul. 16, 1998), Cuyahoga App. No. 72480. Much of the other evidence adduced at trial actually provided a rationale for the jury to discount those opinions. Trowbridge v. Delapaz (June 29, 2000), Cuyahoga App. No. 76405.
 {¶ 26} First, the evidence proved appellant neither mentioned nor exhibited any pain immediately following the accident. Indeed, his son confirmed appellant continued his normal vigorous exercise routines. Although appellant obtained physical therapy treatments for his shoulders after the incident, he did not cite the accident as a reason for seeking those treatments. Appellant's medical records further indicated that any medical problems he had with his neck and shoulders had been resolved by the time of trial.
 {¶ 27} Additionally, appellant failed to seek any medical treatment which he claimed directly related to the accident until over three weeks had passed. By that time, appellant had retained an attorney. Since appellant's knee continuously had plagued him for over twenty years, the jury could conclude appellant's actions were calculated rather than legitimate.
In this same vein, it also is significant that appellant gave testimony at trial that was less than credible. Certainly, the jury could take his lack of credibility into consideration in evaluating his experts' testimony. Appellant had been the source of both their knowledge of what happened to him in the accident and the subjective information upon which they relied in their examinations of him. The evidence also indicated appellant had failed to convey to each of his treating physicians many of the specifics of his medical treatment and history. Appellant, however, had told Anouchi in April 2001 that he was "doing very well" since the March 2000 knee surgery.
 {¶ 28} On the other hand, Morris, Koenig's medical expert, used models in conjunction with appellant's x-rays to illustrate to the jury the condition of appellant's knee over the years. After throughly explaining the long-standing nature of appellant's problems, Morris stated the medical records showed appellant had only a "transient increase in symptoms" from the accident that required little medical care. Morris was "almost 100% certain" appellant's knee problems had nothing to do with the accident.
 {¶ 29} Finally, appellant himself admitted two significant facts. Appellant acknowledged he would be responsible for aggravating his injury if he had continued his strenuous physical regimen despite Goodfellow's advice that he discontinue. Appellant further acknowledged he had neither sought nor performed any physical therapy at all for his knee after the accident.
 {¶ 30} Since competent, credible evidence supported the jury's verdict, the trial court properly denied appellant's Civ.R. 59(A)(6) motion for a new trial. Sauto v. Nacht (Apr. 16, 1998), Cuyahoga App. No. 73118. Accordingly, appellant's first assignment of error is overruled.
Appellant asserts in his second assignment of error that the trial court improperly limited his cross-examination of Morris. He argues that further inquiry into the source of Morris' fee for his testimony in this case would have disclosed his "bias and interest" in favor of Koenig's insurance company, thus complying with Evid. R. 411. The record renders appellant's argument unpersuasive.
 {¶ 31} This issue is examined "pursuant to an abuse of discretion standard." Davis v. Immediate Med. Serv., 80 Ohio St.3d 10, 16,1997-Ohio-363. In Davis, the Ohio Supreme Court reasoned that since the "Evidence Rules favor inclusion of relevant evidence at trial," it serves little purpose to protect juries from "information they already know." The supreme court presumed a jury need not be prevented from knowing that a defense expert may have "bias based on commonality of insurance" interest with the defendant. Id.
 {¶ 32} This case does not, however, present that circumstance. The transcript of Morris' testimony during cross-examination reveals appellant asked several questions about the fee Morris received for his work for appellee Koenig. Morris acknowledged he had charged $2450 for his review of the records, his report, and his time to give his testimony.
In the exchange deemed inadmissible by the trial court, appellant proceeded to ask him "who paid you that $2450?" Morris responded he "had no idea," because such matters were the responsibility of his office manager; he "just [did] the work." Appellant's counsel pressed Morris concerning whether he had received the money through "Allstate;" nevertheless, Morris reiterated his ignorance. Morris merely acknowledged that if Allstate were the defendant's insurer, the fee for his services ultimately may have come from that company.
 {¶ 33} Appellant clearly was unable to establish Morris knew defense counsel had obtained the money to pay his fee from appellee Koenig's insurance company. Moreover, appellant made no proffer of proof for the record that Morris had any type of either a relationship or a tie with the defendant's insurance company of which he was aware that may have influenced his testimony.
 {¶ 34} Under these circumstances, appellant has provided this court with no basis upon which to declare the trial court abused its discretion in preventing appellant from eliciting evidence from Morris concerning Koenig's liability insurance. Evid.R. 411; cf., Ede v. AtriumS. OB-GYN, Inc., 71 Ohio St.3d 124, 1994-Ohio-424. Appellant's second assignment of error, accordingly, is overruled.
 {¶ 35} Appellant's third assignment of error challenges the trial court's order that granted summary judgment to appellee Valley Forge Insurance Company prior to the jury trial. Appellant asserts the trial court incorrectly concluded his employer's CGL policy did not apply to provide UIM coverage for his accident with Koenig pursuant to R.C. 3937.18
and Scott-Pontzer, supra.
The jury determined, however, that appellant's claims against appellee Koenig were unfounded, and this court affirms the jury's verdict with its disposition of appellant's first two assignments of error.
 {¶ 36} In order to establish he is entitled to underinsured motorist coverage, appellant was required to prove the following: 1) his injuries proximately resulted from a motor vehicle accident caused by an uninsured or underinsured motorist; 2) he obtained a judgment against that motorist; and, 3) the judgment did not fully compensate him for the injury he received in the accident.
 {¶ 37} Appellant did not meet the necessary steps in this process. Certainly, Scott-Pontzer does not stand for the proposition that an employer's CGL policy potentially covers any motor vehicle accident injury suffered by an employee simply by "operation of law." Since, therefore, appellant failed to establish any liability in tort existed for his injuries, his third assignment of error is moot. App.R. 12(A)(1)(c).
 {¶ 38} The trial court's order and the jury's verdict are affirmed.
FRANK D. CELEBREZZE, JR., J. and SEAN C. GALLAGHER, J. CONCUR
[1] Appellant improperly designated the defendant insurance company as "CNA Insurance Group" in the caption of the complaint.
[2] Quotes are taken from testimony given by a witness at trial.