OPINION
{¶ 1} Defendants-appellants Craig Stover and Ultra Concrete Construction, Inc. appeal from the July 12, 2004, Judgment Entry of the Licking County Court of Common Pleas granting judgment in favor of plaintiff-appellee James Randall.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Craig Stover (hereinafter "appellant) and appellee James Randall (hereinafter "appellee") were shareholders of appellant Ultra Concrete Construction, Inc. (hereinafter "appellant Ultra"), an Ohio "S" corporation that engaged in light industrial and commercial concrete construction. Appellee started appellant Ultra in 1990 with Joe Glodick. In approximately 1993, appellant bought out Joe's interest. From 1995 until December 31, 2001, appellee and appellant each owned 50% of the outstanding stock of appellant Ultra. Both were officers, directors and employees of appellant Ultra at all relevant times. While appellee was President, appellant was Vice-President.
 {¶ 3} On December 31, 2001, appellant and appellee entered into a three page agreement pursuant to which appellant agreed to purchase appellee's interest in appellant Ultra. Pursuant to the agreement, appellant agreed to purchase appellee's equity in real estate located on River Road in Granville, Ohio, held by appellant Ultra (the parties agreed that the value of appellee's equity was $30,979.68) and appellant Ultra agreed to pay appellee's personal taxes for the year ending in 2001. As memorialized on a separate page of the agreement dated December 31, 2001, and signed by appellee, appellee sold his "one hundred two shares of common stock and my 50% of Ultra Concrete Construction, Inc. to Ultra Concrete Construction, Inc." for $5,500.00.[1] The documents were prepared by appellant and typed on appellant Ultra's letterhead. Effective December 31, 2001, appellee resigned as an officer and director of appellant Ultra in accordance with the parties' agreement.
 {¶ 4} On February 26, 2003, appellee filed a complaint against appellants in the Licking County Court of Common Pleas, alleging that appellants had failed to pay him the amounts due and owing to him under the parties' agreement and to indemnity and hold him harmless on appellant Ultra's debts and obligations. Appellee specifically alleged, in part, that appellant owed him $30,979.68 for half the equity in the real estate and that appellant Ultra owed him $12, 549.00, representing appellee's personal income taxes for the year ending 2001. In turn, appellants, in their answer and counterclaim, alleged that appellee, between January 1, 1999, and December 31, 2001, took advances against future profits of appellant Ultra totaling $49,523.44 when he was only entitled to $27,706.26 during such time and that appellee charged $1,582.35 in personal expenses on an American Express card belonging to appellant Ultra. Appellants, in their counterclaim, further alleged as follows:
 {¶ 5} "12. Plaintiff was an officer of Defendant Ultra Concrete Construction, Inc. from on or about July 17, 1990 until his resignation on December 31, 2001.
 {¶ 6} "13. Because Plaintiff was an Officer of Defendant Ultra Concrete Construction, Inc., Plaintiff is a person who had a responsibility to collect, truthfully account for and pay over withholding taxes imposed upon Defendant Ultra Concrete Construction, Inc. for all periods during which he was an officer, pursuant to section 6672 Internal Revenue Code.
 {¶ 7} "14. The withholding taxes collected by Defendant Ultra Concrete Construction, Inc. for various quarters ending from December 31, 1999 through September 30, 2001 were not paid over.
 {¶ 8} "15. Defendant Craig F. Stover personally paid the outstanding withholding taxes, including penalties and interest, in the amount of $48,243.99 on or about November 11, 2003.
 {¶ 9} "16. Defendant Craig F. Stover is entitled to recover from Plaintiff $24,121.99 which represents one-half of the amount of withholding taxes paid over, including penalties and interest, pursuant to section 6672(d) of the Internal Revenue Code."
 {¶ 10} In short, appellants, in their counterclaim, alleged that the amounts due and owing to appellee were subject to set-offs.
 {¶ 11} Subsequently, the matter proceeded to a bench trial on May 10, 2004. The following testimony was adduced at trial.
 {¶ 12} At trial, appellee testified that, prior to December 31, 2001, he had discussions with appellant about selling appellee's business interest in appellant Ultra and that that appellant "wanted to go by the same way and method we used to buy out Joe Glodick, you know, a fixed price, . . on assets and, . . . corporation assumes all liabilities." Transcript at 25. As a result of the discussions, appellant drafted up the three page agreement on December 31, 2001, appellee signed the same, and appellee received a $5,500.00 check from appellant Ultra for his shares of the stock on such date. Appellee testified that the parties agreed that his share of the equity in the real estate was $30,979.68 and that appellant Ultra was to pay his personal taxes for the year 2001. According to appellee, he never received the $30,979.68 and appellant Ultra never paid his personal taxes. As of the time of trial, appellee had not paid his personal taxes for 2001.
 {¶ 13} Appellee later learned that he allegedly owed appellant Ultra $23,399.53 as reimbursement for advances against appellant Ultra's future income that appellee had taken and was not entitled to. Appellee testified that he discussed the same with appellant on December 31, 2001, when the two discussed the buy-out and that appellant told him that they "were going to do the purchase the same way we bought Joe out. . . . Basically just based on fixed assets and a little money and that was it." Transcript at 36. Appellee did not dispute that he owed appellant Ultra $1,582.35 on the American Express Account, noting that he mistakenly used the business American Express card rather than his own personal American Express card.[2]
 {¶ 14} After December of 2001, appellee received notices from the I.R.S. concerning federal withholding taxes owed by appellant Ultra. Appellee testified that it was common practice for appellant Ultra to forego paying over withholding taxes to the I.R.S. since "[e]ver since the conception we were always running behind due to the way you got your money, the way work was, the way you caught up with your cash, but it was always made good." Transcript at 38. Testimony was adduced that, when money was tight, appellant and appellee chose to pay employees and other debtors and make the I.R.S. wait. According to appellee, appellant Ultra eventually would pay the withholding taxes to the I.R.S. out of revenues and receivables and neither he nor appellant ever had to personally pay any federal withholding taxes that appellant Ultra failed to pay. The following testimony was adduced when appellee was asked whether, on December 31, 2001, he and appellant discussed the federal and state withholding taxes:
 {¶ 15} "Q. On or about December 31, 2001, was there discussion with Craig Stover about the federal and state withholding taxes?
 {¶ 16} "A. Yes.
 {¶ 17} "Q. Did Ultra owe them? Was Ultra delinquent at December 31, 2001?
 {¶ 18} "A. Yes.
 {¶ 19} "Q. What was your discussion with Mr. Stover?
 {¶ 20} "A. You know, are you sure you know what you're getting into; if he could run the business and take care of business.
 {¶ 21} "Q. Which meant what?
 {¶ 22} "A. Well, all the corporate debt, all the debt, take care of the bills, you know; run the business.
 {¶ 23} "Q. Were there other corporate debts that December 31, 2001 besides delinquent taxes?
 {¶ 24} "A. I imagine there were gas bills, electric bills, just, you know, other bills in general.
 {¶ 25} "Q. And you and Mr. Stover still agreed on the fixed price —
 {¶ 26} "A. Right." Transcript at 40.
 {¶ 27} On cross-examination, appellee testified that he was personally assessed by the I.R.S. for the entire amount of the trust fund recovery penalty (the amount of withholding taxes not paid to the I.R.S. by appellant Ultra), but that the same had always been paid by appellant Ultra. When questioned, appellee admitted that, prior to being personally assessed, he was warned by an I.R.S. agent that he could be personally assessed for the trust fund recovery penalty. Appellee testified that there was no provision in the parties' agreement signed by him indicating that appellant agreed to indemnify appellee for any of appellant Ultra's debts or for personal assessment of the trust fund recovery penalty nor was there a provision indicating that appellant agreed to pay appellee's personal liability for appellee's share of the trust fund recovery penalty. Appellee further testified that both he and appellant regularly took advances against the future actual net income of appellant Ultra and that the advances were recorded in each of their respective accounts payable in the corporation. According to appellee, at the end of the fiscal year, the actual net worth of the corporation was calculated and he was given credit for his share, which represented one-half of the actual net income. If appellant Ultra had a good year, the credit was greater than the debit. However, appellee conceded that if appellant Ultra had a bad year, he could end up with a larger debit than credit. According to the information that he saw, at the end of 2001, appellee's total debit to appellant Ultra was approximately $23,000.00. Appellee testified that there was no language in the documents signed by him stating that appellant agreed to forgive this amount or to pay the same to appellant Ultra on appellee's behalf.
 {¶ 28} On redirect, appellee testified that, on December 31, 2001, he and appellant discussed appellant Ultra's existing federal tax deficiencies and that his agreement with appellant with respect to appellee's common stock was still to pay the fixed price irrespective of any tax deficiencies or any accounts receivable on the books. When asked whether the two had discussed the accounts receivable situation or the draws over and above income situation, appellee testified that "[w]e discussed everything." Transcript at 56-57.
 {¶ 29} The next witness to testify at trial was Rosemary Wells, a CPA who performed accounting services for appellant Ultra. Wells testified as follows when asked what effect the sale of appellee's stock had on appellant Ultra's corporate liabilities:
 {¶ 30} "A. The corporation is unaffected by the sale, this sale of stock. The assets are still — the assets of Ultra, the liabilities are still there, the debts of Ultra, so there would be nothing.
 {¶ 31} "Q. Would those liabilities include federal tax debt of Ultra?
 {¶ 32} "A. Be all liabilities.
 {¶ 33} "Q. And state tax debt?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. And would the liabilities of Ultra include the failure to pay withholding taxes on the 941 returns?
 {¶ 36} "A. If there was any obligation owed for payroll taxes, that would have been the corporate debt, it would be corporate liability.
 {¶ 37} "Q. That stayed with Ultra?
 {¶ 38} "A. That stayed with Ultra Concrete." Transcript at 75 — 76.
 {¶ 39} Appellant also testified at the bench trial. Appellant testified that he typed the agreement between himself and appellee after at least two meetings to discuss buying appellee out of the company. Appellant testified that although he paid appellee $5,500.00 for appellee's shares of the stock, he had not paid appellee for his equity in the building owned by appellant Ultra or appellee's personal taxes for 2001, as provided for in the parties' agreement, since "after we closed the year end out, it was determined that [appellee] owed more to Ultra Concrete and myself than I owed to [appellee]." Transcript at 96.
 {¶ 40} At trial, appellant testified that, after appellant Ultra failed to pay federal withholding taxes, he was personally assessed by the I.R.S. in April of 2003 for failing to pay such taxes for four quarters (the fiscal quarters ending Dec. 31, 1999, March 31, 2001, June 30, 2001, and Sept. 30, 2001). The I.R.S. also personally assessed appellee. Appellant testified that he paid such assessment in full using his personal funds since the I.R.S. told him that "[i]t had to come from personal funds" and that the total amount that he paid was $48,243.99. Transcript at 102. Appellant further testified that he and appellee both knew that the withholding taxes for the above four quarters had not been paid and also testified that, prior to April of 2003, he had never been personally assessed before. According to appellant, both he and appellee met with an I.R.S. agent during either late 2000 or early 2001, before any discussions about appellant buying appellee out of the business, and were told that they would be personally assessed if the trust fund taxes were not paid by appellant Ultra. Appellant testified that he never agreed to pay appellee's one-half share of the trust fund recovery penalty assessment or any of appellee's debts or obligations and never agreed either for himself or on behalf of appellant Ultra to indemnify appellee for any debts or obligations of appellant Ultra that appellee might be personally liable for.
 {¶ 41} Appellant also testified that, in addition to a weekly income, both he and appellee had been taking regular monthly advances against future income since approximately 1997. Such advances were always repaid. According to appellant, while appellee took approximately $49,500.00 in advances between January 1, 1999, and December 31, 2001, he was only entitled to approximately $27,700.00, leaving a difference of $21,800.00. Appellant testified that appellee was obligated to repay this money to appellant Ultra and that he had never agreed to forgive such obligation.
 {¶ 42} On cross-examination, appellant testified that the agreement he signed with appellee in December of 2001 did not mention anything about the delinquent federal payroll taxes or the advances against future earnings or accounts receivable. Appellant, however, denied that he had discussed the delinquent payroll taxes with appellee at the time of the sale. When questioned, appellant admitted that there were other outstanding corporate obligations at the time of the sale on December 31, 2001, and that the corporation was going to pay the same since they were "corporate obligations." Transcript at 119. According to appellant, while the original federal payroll tax was a corporate obligation, after the civil penalty was assessed by the I.R.S. due to non-payment of withholding taxes, the tax was no longer a corporate obligation, but a personal one. Appellant testified that he borrowed money to pay the civil penalty and that he could not pay himself back using appellant Ultra's funds since "[i]t's a debt personally to me and I'm not allowed to expense that debt per the I.R.S. rules. I was told I was to pay that personally by the I.R.S. agent." Transcript at 124. On redirect, appellant testified that he was told that if he paid the trust fund recovery penalty personally, he would have a right to contribution against appellee.
 {¶ 43} Sherry Wilson, appellant Ultra's office manager and bookkeeper since 1992, testified at trial that both appellee and appellant took advances against future net income as part of their corporation. According to Wilson, once it was determined that either appellant or appellee or both had taken more advances than entitled to based upon appellant Ultra's actual net income, "[i]t was basically to be repaid or reconciled at the end of the year and by future incomes of the company." Transcript at 135. According to Wilson, appellee took approximately $21,800.00 in advances that he was not entitled to between January 1, 1999, and December 31, 2001.
 {¶ 44} At the conclusion of the trial, the trial court, as memorialized in a Judgment Entry filed on July 12, 2004, found in favor of appellee on appellee's complaint and granted judgment in favor of appellee in the amount of $42, 975.33. The trial court further found against appellants on the counterclaim. The trial court, in its entry, held that appellant was not entitled to contribution from appellee for one half of the amount that appellant paid to the I.R.S. under the trust fund recovery penalty provisions of 26 U.S.C. 6672 because it was a corporate debt only and did not become a personal liability until the parties were assessed in 2003. The trial court noted that the personal assessment in 2003 was made "more than a year after Defendant was the sole shareholder and when Defendant solely had the opportunity to resolve payments or prevent personal liability from attaching." With respect to the advances, the trial court noted that the parties' contract did not specify that the stock sale was subject to recoupment for any advances owed as of the date of the sale.
 {¶ 45} It is from the trial court's July 12, 2004 Judgment Entry that appellants now appeal, raising the following assignments of error:
 {¶ 46} "I. THE COURT ERRED AS A MATTER OF LAW WHEN IT DETERMINED THAT DEFENDANT-APPELLANT CRAIG F. STOVER WAS NOT ENTITLED TO CONTRIBUTION FROM PLAINTIFF-APPELLEE PURSUANT TO 26 U.S.C. SEC. 6672(d) IN THE AMOUNT OF PLAINTIFF-APPELLEE'S SHARE OF THE TRUST FUND RECOVER [SIC] PENALTY PAID TO THE I.R.S. BY CRAIG F. STOVER PERSONALLY.
 {¶ 47} "II. THE DECISION AND JUDGMENT OF THE TRIAL COURT FINDING THAT PLAINTIFF-APPELLEE WAS NOT OBLIGATED TO REPAY DEFENDANT-APPELLANT ULTRA CONCRETE CONSTRUCTON, INC. THE ADVANCES AGAINST THE FUTURE NET INCOME OF ULTRA THAT HE DREW IN EXCESS OF THE AMOUNT ACTUALLY DUE AND OWING HIM IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I {¶ 48} Appellants, in their first assignment of error, argue that the trial court erred in determining that appellant was not entitled to contribution from appellee pursuant to 26 U.S.C. 6672(d) in the amount of appellee's share of the trust fund recovery penalty paid by appellant personally to the I.R.S. In short, appellants contend that appellant was entitled to one-half of the total trust fund recovery penalty[3] that appellant paid to the I.R.S. We agree.
 {¶ 49} The Internal Revenue Code requires an employer to withhold federal income and social security taxes from the wages of his employees. 26 U.S.C. Section 3102(a), 3402(a). See also Luce v. Luce
(S.D. Ohio 2000), 119 F.Supp.2d 779, 783. The taxes so withheld shall be held to be "a special fund in trust for the United States."26 U.S.C. Section 7501(a); Slodov v. United States (1978), 436 U.S. 238,243, 98 S.Ct. 1778, 1783. These taxes are collected from employers on a quarterly basis. See Luce, supra. at 783.
 {¶ 50} 26 U.S.C. 6672 states, in relevant part, as follows: "(a) General rule. — Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over . . ." Pursuant to this section, a 100% penalty (known as a trust fund recovery penalty) may be assessed against any person, whether any employee or officer of a corporation, responsible for the payment of payroll taxes who willfully fails to pay the same. See United States v. Brisbane (8th Cir. 2001), 245 F.3d 1001, 1005. The personal liability created under Section 6672 is separate and distinct from that imposed upon the employer under Section 3403 of the Code. Datlof v. United States (3d Cir. 1966), 370 F.2d 655,656.
 {¶ 51} A company's liability for withholding taxes arises at the moment the taxes are withheld from employee salaries; a contingent liability is immediately created for the amount withheld. Kalb v. UnitedStates (2d Cir. 1974), 505 F.2d 506, 509. The liability becomes fixed on the due date. Id. The person responsible for paying the company's withholding taxes is also contingently liable from that moment. UnitedStates v. Edwards (D.Conn 1983), 572 F.Supp 1527, 1534, citing In reSerignese (D.Conn. 1963), 214 F.Supp. 917.
 {¶ 52} After payment of the penalty, 26 U.S.C. 6672 allows the "responsible person" to seek contribution from any other responsible party who would be liable for the unpaid tax. Spade v. Star Bank (E.D. Pa. 2002), 90 A.F.T.R.2d 2002-7762, 2002 WL 31859431. 26 U.S.C. 6672(d) states, in relevant part, as follows: "Right of contribution where more than 1 person liable for penalty. — If more than 1 person is liable for the penalty under subsection (a) with respect to any tax, each person who paid such penalty shall be entitled to recover from other persons who are liable for such penalty an amount equal to the excess of the amount paid by such person over such person's proportionate share of the penalty . . ." In order to set forth a claim for contribution against others, a person must show that the others are (1) a "responsible person," and (2) they "willfully failed to collect or truthfully account for and pay over" the payroll taxes. Quattrone Accountants, Inc. v. I.R.S. (3d Cir. 1989),895 F.2d 921, 927.
 {¶ 53} For purposes of Section 6672(a), a responsible person is one who is "required to collect, truthfully account for or pay over any tax due to the United States." United States v. Carrigan (3d Cir. 1994),31 F.3d 130, 133. As noted by the court in the recent case of Jean v.U.S (1st Cir. 2005), 396 F.3d 449, "There is no single factor that determines whether an individual is a responsible person. Indicia of responsibility include whether the individual: (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority. . . . . A "court must look at the check-signing authority in the context of financial control." . . . However, `the crucial inquiry is whether the person had the effective power to pay the taxes — that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed.' Therefore, the final three factors in the above list are the most significant "because [they] identif[y] most readily the person who could have paid the taxes, but chose not to do so." Id. at 454. (Citations omitted).
 {¶ 54} In order to satisfy the "willfulness" element of20 U.S.C. Section 6672, one must have some knowledge of failure or risk of failure to remit withholding taxes. Jean, supra. at 454.
 {¶ 55} In the case sub judice, appellee does not challenge appellants' assertion that he is a "responsible person" or that he, along with appellant, willfully failed to collect and pay over federal withholding taxes to the I.R.S. with respect to the four quarters. Appellee himself testified at trial that, with respect to the four quarters, he had authority to decide which creditors were paid and in which order, to sign checks and to borrow money. Appellee further testified that he had authority to decide whether employees were paid before other creditors and admitted that, despite knowing that the withholding taxes had not been paid over to the I.R.S., he authorized that appellant Ultra's employees be paid. Rather, appellee argues that the parties entered into their contract "with full knowledge of the tax withholding situation" and that appellee "assumed no debt or liability, including the withholding tax liability." In short, appellee contends that the withholding tax liability was purely a corporate debt and that, pursuant to the parties' agreement, the debt remained with the corporation.
 {¶ 56} However, as is stated above, a person responsible for paying a company's withholding taxes is contingently liable from the moment taxes are withheld from employee salaries. Thus, appellee, as a responsible person, became personally contingently liable at such point in time.[4]
Such liability, which became fixed on the date the payments were due, was personal, and was not encompassed by the parties' agreement. Furthermore, as is stated above, testimony was adduced at the trial that the corporation had always paid the withholding taxes before and that neither appellant nor appellee had ever been personally assessed. While appellee testified at trial that, on December 31, 2001, he discussed the federal and state withholding taxes and appellant Ultra's delinquency, there is no evidence that the two ever discussed what would happen if they were personally assessed by the I.R.S. In view of the fact that neither had been personally assessed before, such omission is understandable.
 {¶ 57} Based on the foregoing, appellants' first assignment of error is sustained.
 II {¶ 58} Appellants, in their second assignment of error, argue that the trial court's judgment that appellee was not obligated to repay appellant Ultra for the advances against the future net income of appellant Ultra that appellee drew in excess of the amount he was actually entitled to, is against the manifest weight of the evidence. We disagree.
 {¶ 59} A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson, 66 Ohio St.3d 610, 1993-Ohio-9,614 N.E.2d 742.
 {¶ 60} At the trial in this matter, testimony was adduced that both appellant and appellee took advances against future earnings on a regular basis and had been doing so since at least 1997. Testimony also was adduced that if either appellant or appellee or both took greater advances than entitled to, such amount was to be repaid or reconciled. The parties, therefore, were aware, or should have been aware, at the time of their agreement that appellee may have taken greater advances than entitled to and might, therefore, owe appellant Ultra money. However, as noted by the trial court, the contract, which was prepared by appellant, "does not specify that the stock sale is subject to recoupment for advances owed at the date of sale and not offset by actual earnings at that time, but not known at the time, . . ." In short, we find that there was competent and credible evidence supporting the trial court's decision.
 {¶ 61} Appellants' second assignment of error is, therefore, overruled.
 {¶ 62} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed in part and reversed in part.
Edwards, J., Hoffman, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed in part and reversed in part. Costs assessed one-half to appellant and one-half to appellee.
[1] The agreement indicated that appellee had received a check for such amount.
[2] The amount owed on the American Express card is not a subject of this appeal.
[3] The total amount that appellant paid to the I.R.S. was $48,243.99, so half of such amount would be approximately $24,122.00.
[4] See Davis v. U.S. (9th Cir. 1992), 961 F.2d 867, 873, ". . . liability as a responsible person attaches each time salaries are paid during the course of a quarter. `As the employer withholds taxes from the employees, a contingent liability is created. The liability merely becomes fixed on the date when the payments are due.'" (Citations omitted).