OPINION
{¶ 1} Defendant-appellant Jim Cross appeals from the July 8, 2005, Civil Stalking Protection Order issued by the Richland County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On June 23, 2005, appellee Jamie Daugherty filed a Petition for a Stalking Protection Order against appellant in the Richland County Court of Common Pleas. Appellee, in her petition, alleged as follows:
 {¶ 3} "Jim [appellant] shows up at my work (Buffalo Wings 
Rings) and wants me to sit and talk to him. I tell him I'm busy and that I don't want to talk to him but then he gets upset and rude and starts telling me things like he is going to cut the brake lines on my car and he hopes that I die. He also calls me all the time and threatens the same."
 {¶ 4} A temporary ex parte Civil Stalking Protection Order was issued by the trial court on June 23, 2005. Subsequently, a full hearing on appellee's petition was held on July 8, 2005. The following testimony was adduced at the hearing.
 {¶ 5} At the July 8, 2005, hearing, appellee testified that appellant, a police officer, was her ex-boyfriend. According to appellee, appellant pulled a knife on her, threatened to cut her car brake lines, and waited for her after work. Appellee also testified that appellant had hit her before. When asked about an incident that occurred the Friday before the June 23, 2005, ex parte hearing, appellee testified as follows:
 {¶ 6} "A. Um, he came to my work at Buffalo Wings, and I served him just like I would any other customer, and then he wanted to talk to me and he was getting rude and obnoxious, so I asked him to leave, and he left, and then he called my phone and was messing with my phone, changed my password, changed my voice mail so I couldn't listen to my phone and then he started calling me at the hospital where I was, when I was working there and told me he was waiting for me to get off work." Transcript at 6.
 {¶ 7} While appellant did not threaten appellee while at Buffalo Wings, appellee testified that, during a telephone call to appellee at the hospital, appellant "said that he was waiting for me to get off work and that's when he said he was going to cut the brake lines on my car." Transcript at 6.
 {¶ 8} Appellee also testified that in November of 2004, she was with appellant at a party. Appellant was drinking and spit beer in appellee's face. After leaving the party, the two went to a hotel. According to appellee, when she attempted to leave the hotel room, appellant kept grabbing her and pushing her around and then hit her. Appellee then left the room and came back. According to appellee, when she returned, appellant had "his knife out playing with it and pulled his knife on me, . . ." When appellee asked appellant what he was doing, appellant indicated that he thought someone was going to break into the hotel room. When asked whether appellant threatened to do anything to her with the knife, appellee responded in the negative.
 {¶ 9} Appellee continued dating appellant until approximately two months before the July 8, 2005 hearing and the two called each other during the two months before the hearing. Appellee testified that appellant's calls were not unwelcome and that nothing else happened between November of 2004 and the ex parte hearing in June of 2005.
 {¶ 10} At the hearing, appellant testified that appellee called him on June 20, 2005 and asked him to come see her at Buffalo Wings and, after the two argued, appellant left. According to appellant, in November of 2004, the two started arguing while at a bar because appellant was concerned that appellee was drinking while underage. Appellant testified that a male who was at the bar "was telling me obscene things like he wants to basically get with my girlfriend." Transcript at 17. Appellant, who was upset by the comments, then left and went to a hotel room with appellee. The following is an excerpt of appellant's hearing testimony:
 {¶ 11} "We met up with them and we were at the bar and we were drinking, and Jamie started drinking under age, and I told her my concerns of that, and she told me you know, quit being pushy, you know let her drink, she's old enough, I said you know you gotta be 21, and she said she was a big girl, can do what whatever she wants, so that's when it started, little arguing back in November, about her drinking under age, and then the male part of this party got real drunk, and he was telling me obscene things like he wants to basically get with my girlfriend because he's a black individual, and he said once you go black you never go back, and he started harassing me about Jamie, and then he said he was going to take either my truck or my girlfriend for a ride during the night, so that upset me, and I got pretty you know, upset about that, so I told Jamie, come on, let's go, so we rode with them unfortunately, so we had to ride back to the hotel with the, and I went to go in our room, just to be left alone, because I didn't want any part of that party, and she's like I want to go out there with them, and I said you know, in your best intentions you've been drinking, you're intoxicated, you need to stay in the room so you don't get in trouble. And she kept trying to leave, and yes — I didn't hit her, but I grabbed her by the arm and said you need to stay in the room, and she said I'm going to do whatever I want. I said fine, fine then go, go do whatever, and then I proceeded to go to bed, and I woke up in the morning and left. And I did you know — I carry a knife with me, and yes I did have it out. I was just playing with it. It doesn't sound like a good thing to do at the time, but, you know, but I didn't threaten anyone with it, I just had it out. And then she's like, why are you all upset and I told her I don't want that guy coming in our room, I don't want him being around me or her, I told her you know, I want him to stay away from my truck and whatnot. And you know, I just went to bed then." Transcript at 17-18.
 {¶ 12} During his testimony, appellant denied ever calling the hospital where appellee worked and threatening to cut appellee's brake lines.
 {¶ 13} Pursuant to a Civil Stalking Protection Order filed on July 8, 2005, the trial court granted appellee a protection order effective until June 23, 2006. The trial court, in its order, made the following findings: "In November of 2004 Respondent pushed and hit Petitioner during an altercation at Scores Bar and ending up at a motel at which they were staying. During the incident, Respondent brandished a [knife] in an intimidating manner and was verbally abusive toward Petitioner. The Friday prior to June 23, 2005, Respondent and Petitioner engaged in a verbal altercation at Buffalo Wings Restaurant resulting in Respondent making verbal threats directly to Petitioner and thereafter by telephone."
 {¶ 14} Appellant now raises the following assignments of error on appeal:
 {¶ 15} "1. THE TRIAL COURT ERRED IN THAT THE RECORD DOES NOT CONTAIN SUFFICIENT EVIDENCE TO WARRANT THE ISSUANCE OF THE CIVIL STALKING PROTECTION ORDER.
 {¶ 16} "2. THE TRIAL COURT'S DECISION TO GRANT THE CIVIL STALKING PROTECTION ORDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I, II {¶ 17} Appellant, in his two assignments of error, argues that the trial court's decision to grant a Stalking Civil Protection Order was against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 18} As an initial matter, we note that some courts have held that once a protection order expires, any appeal from the same is moot. See, for example, VanMeter v. VanMeter, Franklin App. No. 03AP-1107, 2004-Ohio-3390. However, at least one other court has found that an unspecified exception to the mootness doctrine applies.[1] See, for example, Smith v. Smith,
Wyandot App. No. 16-01-03, 2001-Ohio-2139. Furthermore, appellant, at the July 8, 2005 hearing, indicated to the trial court that, since he was a police officer, "having a protection order against . . . me, it's going to be pretty hard if I want to pursue another career in another department. . . ." Transcript at 21. For such reason, we shall address the merits of appellant's appeal even though the Civil Stalking Protection order expired on June 23, 2006.
 {¶ 19} The decision whether to grant a civil protection order lies within the sound discretion of the trial court. Olenik v.Huff, Ashland App. No. 02-COA-058, 2003-Ohio-4621, at paragraph 21. Therefore, an appellate court should not reverse the decision of the trial court absent an abuse of discretion. In order to find an abuse of discretion, this court must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 20} We further note that a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. C.E.Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279,280, 376 N.E.2d 578. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson, 66 Ohio St.3d 610,1993-Ohio-9, 614 N.E.2d 742, 1993-Ohio-9. The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. Cityof Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 21} R.C. Section 2903.214 governs the filing of petition for a civil stalking protection order. R.C. Section 2903.214(C) provides: "A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member by filing a petition with the court".
 {¶ 22} To be entitled to a stalking civil protection order, the petitioner must show, by a preponderance of the evidence that the respondent engaged in menacing by stalking, a violation of R.C. Section 2903.211, against the person seeking the order. SeeTumblin v. Jackson, Coshocton App. No. 06CA002, 2006-Ohio-3270.
 {¶ 23} R.C. Section 2903.211(A), "menacing by stalking", states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."
 {¶ 24} R.C. 2903.211 further provides as follows:
 {¶ 25} "(D) As used in this section:
 {¶ 26} "(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents . . .
 {¶ 27} "(2) "Mental distress" means any of the following:
 {¶ 28} "(a) Any mental illness or condition that involves some temporary substantial incapacity;
 {¶ 29} "(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services."
 {¶ 30} "R.C. 2903.211(D)(1) does not require that a pattern of conduct be proved by events from at least two different days. Arguably, a pattern of conduct could arise out of two or more events occurring on the same date, provided that there are sufficient intervals between them." One incident is insufficient to establish a "pattern of conduct." State v. Scruggs (2000),136 Ohio App.3d 631, 634, 737 N.E.2d 574, 576. See also Daytonv. Davis (1999), 136 Ohio App.3d 26, 735 N.E.2d 939.
 {¶ 31} Appellant specifically contends that, in the case sub judice, there was no pattern of conduct, that he did not knowingly cause appellee to believe that he would cause physical harm or mental distress to her, and that appellee did not believe that appellant was going to cause physical harm or mental distress to her. However, based upon our review of the record, we find that the trial court's decision to issue a protection order was not against the manifest weight and sufficiency of the evidence and that the trial court did not abuse its discretion in issuing such an order. As is set forth above, appellant, in November of 2004, pushed and hit appellee and, during the same incident, brandished a knife. In addition, in June of 2005, appellant threatened to cut appellee's brake lines. Appellee also testified that appellant had hit her before. We find that these incidents constituted threats of bodily harm and that appellant, as evidenced by these incidents, knowingly caused appellee to believe that appellant would physically harm her.
 {¶ 32} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 33} Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.
By: Edwards, J. Wise, P.J. and Gwin, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] We note that a court may hear an otherwise moot case when the issues are capable of repetition, yet evade review. SeeState ex rel. Beacon Journal Publishing Co. v. Donaldson (1992),63 Ohio St.3d 173, 175, 586 N.E.2d 101. However, such exception to the mootness doctrine applies only in exceptional circumstances when both: (1) the challenged action is too short in duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.State ex rel. Calvary v. Upper Arlington, 89 Ohio St.3d 229,231, 729 N.E.2d 1182, 2000-Ohio-142. The second exception to the mootness doctrine concerns matters involving "a matter of great public interest." Franchise Developers, Inc. v. Cincinnati
(1987), 30 Ohio St.3d 28, 505 N.E.2d 966. There is also an exception where a debatable constitutional question remains to be resolved. See Smith v. Leis, 106 Ohio St.3d 309, 835 N.E.2d 5,2005-Ohio-5125.