OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


Myers, Appellee, v. Garson, Appellant, et al.
[Cite as Myers v. Garson (1993),      Ohio St.3d     .]
Appellate procedure -- Appellate court must not substitute its
     judgment for that of the trial court where there exists
     some competent and credible evidence supporting the
     findings of fact and conclusions of law rendered by the
     trial court.
     (No. 92-868 -- Submitted April 28, 1993 -- Decided July 7,
1993.)
     Appeal from the Court of Appeals for Summit County, No.
15214.
     The pertinent facts of this action, as found by the trial
court, are as follows.  Plaintiff-appellee, Forrest D. Myers,
and defendant-appellant, Harold M. Garson, had been in the
business of developing raw land for sale to others for many
years.  On or about June 6, 1965, appellee and appellant
entered into an agreement for the purchase and financing of
certain raw land in Bath Township, Summit County.  As part of
their "gentlemen's agreement," appellee would invest money and
appellant would develop the raw land.  While the parties
initially agreed to a fifty-fifty split of profits on the
future sale of the property, they subsequently refined their
agreement to reflect a one-third split of profits when they
added appellant's business associate, Frank Wells, to their
arrangement.  However, in 1967, appellant took over Wells'
one-third interest in the arrangement.
     In 1968, the agreement between appellee and appellant was
further refined for refinancing, and the new agreement was
reduced to writing in a countersigned letter of January 2, 1968.
     In 1970, appellant conveyed an additional interest in the
Bath Township property to appellee in consideration of
additional funds advanced by appellee from 1968 to 1970.  At
that time, appellee once again owned fifty percent of the
property in issue, and as of March 23, 1970, the trial court
found that appellee was to recover fifty percent of the profits
from the ultimate disposition of the property.  The land was
thereafter developed as a traditional housing development, and
in 1972, Phase I of the development consisting of twenty-three

lots was begun.  No profits were realized from the development of Phase I, and subsequently, appellee assisted in the obtainment of sewer and gas easements and consents to annexation needed to begin Phase II of the development.

By 1979, it is undisputed that appellee had advanced $107,000 to the development and the parties attempted to set forth their respective positions and determine the repayment of advances, overhead and potential profits.  At that time, appellee quitclaimed his interest in the property to appellant, but the parties never totally agreed to any new arrangement for payment of monies.

During the early 1980s, Phase II of the development of the property was completed at a profit of $1,353,861.

On December 28, 1984, appellee filed a complaint in the court of common pleas for breach of contract against appellant and several other entities who are no longer involved in this action.  In his complaint, appellee essentially alleged that his 1965 agreement with appellant entitled him to the return of his investment as well as fifty percent of the profits from the entire development which became known as "Bathcrest Estates." Over the next several years extensive discovery ensued, and the matter eventually proceeded to a bench trial in late 1987 and early 1988.

In a judgment entry dated June 10, 1988, the trial court held, inter alia, that appellee and appellant were equal partners in the land development project and that appellee was entitled to his original investment as well as fifty percent of the profits realized from the sale of the land development. Subsequent motions for prejudgment interest and a new trial were denied, and in a judgment entry dated November 22, 1988, the trial court amended its prior entry by finding that the relationship between the parties was not a legal partnership but rather a joint venture.

Upon appellant's appeal, the court of appeals reversed and remanded.  The appellate court held that the trial court erred in finding a joint venture agreement between the parties, and that the cause should be remanded for a new trial.  See Myers v. Garson (July 12, 1989), Summit App. No. 13939, unreported. On November 29, 1989, appellee's motion to certify the record before this court was overruled.

On remand, both parties filed motions for summary judgment pursuant to Civ. R. 56.  In a judgment entry dated September 9, 1990, the trial court granted summary judgment in favor of appellee on the money advanced by him to appellant ($107,000), but directed that all other issues be determined at trial. Thereafter, the parties agreed to resubmit the cause for adjudication on the pre-existing trial record.  In an opinion issued June 17, 1991, the trial court made the following conclusions of law:

"1.  The hand-shake agreements between the Plaintiff and Defendant were never formalized and, as a matter of law, their relationship was as developers in raw development of land until 1970.

"2.  As the course of the development of the land for residential sale began in the 1970s, the relationship substantially changed as a result of the development of the property into a residential complex.

"3.  As a matter of law, although Defendant sought to define their roles in 1979 as being a non-equal relationship, the Plaintiff rejected that theory.  As a matter of law, the redefinition of the 1970 through 1979 relationship was never culminated.

"4.  As a matter of law, Plaintiff and Defendant are entitled to the return of their original investment. Plaintiff's is $107,000 and Defendant's is $307,000.

"5.  As a matter of law, there was no agreement between the parties after 1979.  The exhibits clearly establish that there was no mutual understanding by either the Plaintiff or Defendant as to any shared profits for further development.

"6.  As a matter of law, the Plaintiff and defendant have no obligation to each other other than $107,000 due and owing as of 1979.

"7.  As a matter of law, Plaintiff is entitled to $107,000 plus interest and costs from 7/12/79.

"8.  As a matter of law, Plaintiff is not entitled to any profits from the development of Phase II.

Upon further appeal by appellee, the court of appeals reversed in part in a split decision.  In relevant part, the appellate court majority concluded as follows:

"The trial court's determination that Myers and Garson rescinded their original agreement in 1979 is warranted by the record.  However, there is no support for the conclusion that Myers intended to abandon his share of the profits from the fourteen year endeavor and simply accept a return of his investment.  Rather, the evidence indicates that the parties believed Myers had sold his interest in the Bathcrest project to Garson for $307,000.

"***

"The only sensible interpretation of the events which transpired, consistent with the parties' most likely intentions, is that the original agreement was replaced in 1979 with a new arrangement whereby Myers would be paid $307,000 and released from his obligations while Garson would receive full title to the property and all profits in the Bathcrest project.  The trial court erred by failing to give full effect to the novation that was thus established."

The appellate court therefore modified the judgment of the trial court pursuant to App.R. 12(B), and held that Myers was entitled to $307,000 plus interest from July 12, 1979, and costs.

The cause is now before this court pursuant to the allowance of a motion to certify the record.

Brouse & McDowell, Linda B. Kersker and David B. Nolin, for appellee.

Skidmore & Associates Co., L.P.A., Archie W. Skidmore and Spiros Vasilatos, Jr., for appellant.


A. William Sweeney, J.    Preliminarily, appellant Garson essentially contends that the decision by the court of appeals was tainted because Judge John W. Reece did not recuse himself from the appellate panel below, since at an earlier state of the present litigation, Judge Reece had in fact recused himself

from hearing the action while he was sitting as a trial judge.1  While one can perhaps argue that Judge Reece should have disqualified himself from sitting on the appellate panel below given his prior recusal, we remain unpersuaded because appellant raised no objections until after he had obtained an adverse decision from the court of appeals.  In our view, appellant had several opportunities to object to the presence of Judge Reece on the court of appeals panel; however, no objection was raised in a timely manner.  As noted by the court of appeals upon appellant's motion for reconsideration, appellant could have contacted the court to discover Judge Reece's presence on the appellate panel after appellant had waived oral argument, but he neglected to do so.  Therefore, we reject appellant's hollow assertions that Judge Reece's involvement with the decision below somehow prejudiced his reliability or impartiality.

With respect to the determinative issue in this appeal, appellee Myers argues, inter alia, that the court of appeals merely followed the dictates of App. R.12(B) by "render[ing] the judgment or final order that the trial court should have rendered."  It is appellee's contention that the court of appeals below did not substitute its judgment for that of the trial court, but simply corrected a legally insupportable judgment of the trial court by finding  that a novation took place between the parties.

We have reviewed the extensive record developed during this protracted litigation and find persuasive arguments and elements supporting the reasoning of the court of appeals below.  However, as we have often noted in the past, where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court.  See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276; and Cohen v. Lamko, Inc. (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407.  In addition, this court has held that a reviewing court is not authorized to reverse a correct trial judgment merely because erroneous reasons were assigned as a basis therefor. Agricultural Ins. Co. v. Constantine (1944), 144 Ohio St. 275, 284, 29 O.O. 426, 430, 58 N.E.2d 658, 663.

As this court observed in Seasons Coal, supra, at 80, 10 OBR at 410, 461 N.E.2d at 1276:  "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

While it is true that the trial court decision of June 17, 1991 was based on the resubmission of the pre-existing trial court record, it is also true that all the pertinent trial court proceedings in this cause were presided over by the same trial judge.

The appellate court below and appellee herein emphasize that the trial court had specifically found that appellee, as of March 23, 1970, "was to recover 50% of the profits from the ultimate disposition of the property,"  but concluded that

appellee was not entitled to any profits from the sale of the property in issue.  While the finding of the trial court in this respect does indeed appear to be inconsistent with its ultimate holding, the particular circumstances and course of dealings between the parties, as set forth in the record, while not explicitly set forth in the trial court's 1991 decision, arguably support the trial court's conclusion.  For example, although the trial court made no specific findings as such, appellee's refusals to advance further funds to appellant between 1970 and 1976 could be characterized as breaches of the parties' agreement that profits be divided equally, and thus would not entitle appellee to any profits from the ultimate disposition of the subject property.  In addition, there was sufficient evidence in the record to support the apparent conclusion of the trial court that the profit-sharing agreement between the parties, contemplated profit sharing only with respect to Phase I of the Bathcrest Estates development.  Since Phase I yielded no profit, appellee would be entitled to no profit from the disposition of that property.  Moreover, profits from the land development were not realized until the sale of Phase II of the development, and Phase II was not completed until after 1979 when the parties could not reach any agreement whatsoever.

In any event, the court of appeals below went beyond its prerogative as set forth in App.R. 12 and did not accord due deference to the judgment of the trial court.  In effect, the appellate court substituted its judgment for that of the trier of fact.  While the court of appeals' finding of a novation between the parties appears somewhat persuasive when viewed in an after-the-fact context of what would have been most advantageous from appellee's standpoint, the record is devoid of any substantial evidence to support such a finding.

Thus, we reaffirm our prior reasoning in Seasons Coal, supra, and hold that an appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court.  Upon a careful review of the instant record, we find there was competent and credible evidence supporting the judgment of the trial court and, therefore, that judgment must be reinstated.

Notably, the cause sub judice amply points out that different persons can arrive at different conclusions in a case based on the same evidence.  If nothing else, the protracted history of the instant cause unquestionably underscores the proposition that parties to an agreement should protect their interests by reducing all of their understandings to writing.  So-called "gentlemen's agreements" not totally put in writing can become shaded or altered in the minds of the contracting parties over time, when changed circumstances and/or faulty memories make it more advantageous to assert a different meaning to an agreement than that which was originally intended.  The vagaries of the legal system cannot guarantee that the "true" understanding of each of the parties is the one that ultimately becomes the agreement to which they are legally bound.

Based on all the foregoing, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

Judgment reversed.

Moyer, C.J., Douglas and Resnick, JJ., concur.

Wright, F.E. Sweeney and Pfeifer, JJ., dissent.

FOOTNOTE:

1  As conceded by counsel for appellant during oral argument, there is nothing in the record indicating the reason why Judge Reece recused himself from sitting on this case as a trial judge.  Thus, there is nothing in the record to indicate that Judge Reece was duty-bound to recuse himself from the panel in the court of appeals below.

Wright, J., dissenting.    Not long ago a majority of my colleagues declared that we sit as a court of equity.  See State v. West (1993), 66 Ohio St.3d 508,      N.E.2d    .  I cannot agree with such a premise; however, I do believe we should apply common business sense to cases involving commercial transactions.  We certainly failed in this respect today.

Stripped of irrelevant matters, the facts show two men entering into a real estate development enterprise nearly thirty years ago.  Over the years Myers put up $107,000 while Garson negotiated the sundry deals.  The two men came to a parting of the ways in 1979.  Myers quitclaimed his interest in the property to Garson.  Garson, in turn, accepted the property, offered $307,000 in consideration thereof, and continued the enterprise.  Garson set aside the $307,000 as an account payable to Myers.2

This litigation began in 1984 and led to a court of appeals' holding that the financier, Myers, was entitled to $307,000 plus interest.  The court held that the enterprise ended in 1979 and Myers was not entitled to profits earned subsequent to that date.  The court below called this relatively simple deal a "novation."  My colleagues in the majority have rejected this appellation in order to reach a contrary result.

Incredibly, by our pronouncement today, the former partner now owes $107,000, which is about a third of the debt he expressly acknowledged in writing nearly fourteen years ago.  Did reason prevail here?  I think not.  We wonder why folks criticize the courts.  As Justice Robert H. Jackson once bemoaned:   "I give up.  Now I realize fully what Mark Twain meant when he said, 'The more you explain it, the more I don't understand it.'"  Securities & Exchange Comm. v. Chenery Corp. (1947), 332 U.S. 194, 214, 67 S.Ct. 1760, 1762, 91 L.Ed. 1995, 2008 (Jackson, J., dissenting).

I dissent from this unreasonable and seemingly ludicrous result.

FOOTNOTE:

2  The court of appeals explained the pertinent facts more clearly than did the majority:

"The trial court's determination that Myers and Garson rescinded their original agreement in 1979 is warranted by the record.  However, there is no support for the conclusion that Myers intended to abandon his share of the profits from the fourteen year endeavor and simply accept a return of his investment.  Rather, the evidence indicates that the parties

believed Myers had sold his interest in the Bathcrest project to Garson for $307,000.

"Myers never expressly rejected Garson's offer to buy out his share.  Instead, he quitclaimed his interest in the real estate to Garson, consistent with the proposal.  Myers' correspondence of July 12, 1979 to Garson's attorney accompanying the deed acknowledged the $200,000 to be paid in addition to the return of his original investment [of $107,000].  Verification of this amount was requested.  Elizabeth Thompson, Myers' assistant, forwarded a letter dated July 23, 1979 on Myers' behalf inquiring as to when the $200,000 was to be paid.  Garson proceeded with the remainder of the project, he testified, believing an agreement had been reached.  A sum of $307,000 was set aside in an account for Myers.  Myers completely discontinued his participation in the endeavor and did nothing in the next five years to dispel Garson's understanding that he was on his own.  Indeed, a letter from Myers to his son dated June 19, 1983 suggests that Myers was under the impression that Garson owed him $200,000. In any event, Myers did not once demand performance upon the original pre-1979 agreement until after Garson had realized a substantial profit on the completed project."  (Emphasis sic.)

Pfeifer, J., dissenting.  Forrest Myers thought he had a simple problem when he filed suit in 1984 to unwind a real estate development venture he entered into with Harold Garson in 1965.

Judge Sheila G. Farmer, after weighing the evidence, provided a reasonable solution: an equal division of profits after return of capital to the parties.  Unfortunately, Judge Farmer, on remand, then decided to proclaim the legal status of the relationship as being terminated.  Almost a decade later Forrest Myers has seen this dispute through two trial judges, two passes through the Summit County Court of Appeals and one review by the Supreme Court.  Given all that legal scrutiny, the specific legal status of the Myers-Garson business venture has yet to be identified.  The reviewing courts have been quick to tell the parties what their business relationship was not, but reticent to announce what it was.

Instead of providing a reasonable winding up of this business and an end to the dispute, reviewing courts have lost their way -- wandering about in search of legal theory.

The trial court was correct the first time -- then on retrial misunderstood what the court of appeals apparently expected her to do.  Judge Farmer crafted the appropriate remedy the first time she weighed the evidence.  We should reinstate her first judgment entry -- a division of the profits after a return of original capital to the parties.

Judge Farmer, before the first appeal, had the opportunity to assess the issues that might warrant some result other than that the parties agreed to an equal division of the profits. If the project failed, had Myers avoided potential future liability by quitclaiming the property to Garson?  Was Garson forced to invest personal funds that should have been contributed by Myers?  Did Garson have to devote more of his own time and development expertise to complete the project as a result of Myers' effort to terminate?  Or did the quitclaim deed by Myers simply facilitate Garson's ability to expedite

the documents necessary to complete the financing and subsequent sale of individual home sites?

All the above matters and many others were before Judge Farmer when she initially tried the case. Upon consideration of all the evidence, the history of the relationship between the parties on prior projects as well as the specific details of this venture, the trial court decided the case.

The admonitions of the majority to the court of appeals are appropriate in this case; however, after offering advice, the majority reinstates the wrong decision of the trial court. This leaves Forrest Myers, after having risked $107,000 in 1965, and after almost a decade of litigation, with no part of the $1,353,861 in profits from the development, no interest on the original investment until 1979, and with legal fees most probably sufficient to wipe out the funds awarded under this court's holding. Talk about a haircut!

Wright, J., concurs in the foregoing dissenting opinion.