OPINION *Page 2 
{¶ 1} Defendant-Appellant Land and Shore Drilling, LTD (hereinafter L S) appeals a judgment of the Court of Common Please of Delaware, Ohio which found L S is 100 percent liable for offsite damages and clean up costs, and 65 per cent liable for onsite damages/costs, arising out of a blow out of an oil well. The court found plaintiff-appellee D.T. Atha Inc. was 35 percent liable for the onsite costs and breach of contract, and defendant-appellee Greenwich Insurance Company is entitled to reimbursement out of money paid by L S. The court found plaintiff-appellee MFC Drilling, Inc. was not liable for any damages. In total, D.T. Atha is liable in the amount of $105,867.15 and L S, $589,170.43. L S assigns nine errors to the trial court:
 {¶ 2} "I. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT FOUND AS A MATTER OF FACT THAT A JOINT VENTURE HAD BEEN CREATED BECAUSE THIS FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE NO SUCH EVIDENCE WAS INTRODUCED BUT RATHER THE EVIDENCE SO INTRODUCED WAS UNCONTRADICTED THAT THE MEMBERS IN THE WORKING INTEREST WERE INVESTORS AND THAT CLERMONT HAD THE FIDUCIARY RELATIONSHIP TO THEM.
 {¶ 3} "II. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF LAW THAT LESS THAN ALL THE MEMBERS OF A JOINT VENTURE CAN BRING AN ACTION ON BEHALF OF THE JOINT VENTURE ENTITY OR ALL THE OTHER MEMBERS OF THAT VENTURE.
 {¶ 4} "III. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF LAW THAT PLAINTIFF-APPELLEE, *Page 3 
D.T.ATHA, INC., AS THE OPERATOR OF THE KRAUSS WELL NO. 1, AND PLAINTIFF-APPELLEE, MFC DRILLING, INC., AS AN INVESTOR IN THAT WELL, WERE PROPER PARTY PLAINTIFFS (THE REAL PARTIES IN INTEREST) BECAUSE ATHA HAD PAID NONE OF THE COSTS ASSOCIATED WITH THE CLEAN UP AND MFC ACTED AS A VOLUNTEER IN DOING SO.
 {¶ 5} "IV. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF FACT THAT PLAINTIFFS-APPELLEES D.T. ATHA, INC. AND MFC DRILLING, INC. HAD BROUGHT THIS ACTION IN THEIR REPRESENTATIVE CAPACITIES BECAUSE THAT FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 6} "V. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF LAW THE APPLICATION OF A NEGLIGENCE STANDARD TO THE CONDUCT OF PLAINTIFFS-APPELLEES, D.T. ATHA, INC., AND DEFENDANT-APPELLANT, LAND AND SHORE, LTD., FOR COSTS INCURRED FOR ONSITE AND OFFSITE POLLUTION CLEANUP RESULTING FROM THE BLOWOUT OF SEPTEMBER 20TH, 2004, BECAUSE THEIR RELATIONSHIP WAS CONTRACTUAL IN NATURE REQUIRING THEIR CONDUCT TO BE PERFORMED IN ACCORDANCE WITH GOOD DRILLING PRACTICES, AND THUS MAKING REDUNDANT LIABILITY FOUNDED UPON NEGLIGENT CONDUCT.
 {¶ 7} "VI. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF LAW THE APPLICATION OF A COMPARATIVE NEGLIGENCE/TORT STANDARD FOR ANY BREACHES OF CONTRACT RESULTING FROM THE CONDUCT OF PLAINTIFF-APPELLEE, D.T. *Page 4 
ATHA, INC., AND DEFENDANT-APPELLANT, LAND AND SHORE, LTD., FOR COSTS INCURRED FOR ONSITE POLLUTION CLEANUP RESULTING FROM THE BLOWOUT OF SEPTEMBER 20TH, 2004.
 {¶ 8} "VII. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT FOUND AS A MATTER OF LAW THAT DEFENDANT-APPELLANT, LAND AND SHORE, LTD. WAS LIABLE FOR COSTS INCURRED FOR ONSITE AND OFFSITE POLLUTION CLEANUP RESULTING FROM THE BLOWOUT OF SEPTEMBER 20TH, 2004, DESPITE THE FACT THAT IT FOUND THAT LAND SHORE AND PLAINTIFFS-APPELLEES, D.T. ATHA, INC. HAD COMMITTED MUTUAL BREACHES OF CONTRACT.
 {¶ 9} "VIII. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT FOUND AS A MATTER OF FACT THAT THE PROXIMATE CAUSE FOR OFFSITE POLLUTION CLEANUP COSTS THAT RESULTED FROM THE BLOWOUT OF SEPTEMBER 20TH, 2004, WAS THE CONDUCT OF DEFENDANT-APPELLANT, LAND AND SHORE, LTD. BECAUSE THAT FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHICH SHOWED THAT THERE COULD HAVE BEEN MULIPLE CAUSES FOR THE OFFSITE POLLUTION AND PLAINTIFFS-APPELLEES D.T. ATHA, INC. AND MFC DRILLING, INC. FAILED TO MEET THEIR BURDEN OF PROOF BY ESTABLISHING WHICH CAUSE WAS THE PROXIMATE CAUSE FOR WHICH LAND SHORE MAY HAVE BEEN RESPONSIBLE.
 {¶ 10} "IX. THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT HELD AS A MATTER OF LAW THAT PLAINTIFF-APPELLEE, *Page 5 
GREENWICH INSURANCE COMPANY, AS THE SUBROGATED INSURER FOR PLAINTIFF-APPELLEE, D.T. ATHA, INC., IS ENTITLED TO A RECOVERY [REIMBURSEMENT] OF 100% BECAUSE ATHA HAD NOT PAID ANY OF THE COSTS INCURRED FOR POLLUTION CLEANUP RESULTING FROM THE BLOWOUT OF SEPTEMBER 20TH, 2004 AND BECAUSE THE LOWER COURT FOUND ATHA 35% COMPARATIVELY NEGLIGENT."
 {¶ 11} On September 16, 2005, appellees, D.T. Atha, Inc. (the "Operator"), Greenwich Insurance Company ("Greenwich"), and MFC Drilling, Inc. ("MFC") filed this action seeking damages from an uncontrolled well blowout which occurred on September 20, 2004, while drilling for oil at the Krauss No. 1 Well, located in Kingston Township, Delaware County, Ohio. On October 6, 2005, L S filed its answer, asserting the affirmative defenses of comparative negligence, assumption of the risk and failure to perform conditions precedent, among others. The matter proceeded to a bench trial.
 {¶ 12} The trial court made extensive findings of fact in its December 4, 2007 judgment entry. Because of the complexity of the facts, we quote them at some length:
 {¶ 13} "* * *
 {¶ 14} "The Parties
 {¶ 15} "One hundred percent of the working interest in Krauss No. 1 Well was owned by Clermont Natural Gas Company (10.25%), Pat Fagan and Friends (5%), D.T. Atha, Inc. (3%), John Ackerman (5%), Bill Barker (5%), G H Drilling, Inc. (6.25%), Mason Energy, LLC (12.5%), and MFC Drilling, Inc. (50%), (collectively `the working interest owners'). *Page 6 
 {¶ 16} "Plaintiff, D.T. Atha, Inc. (the `Operator'), was the operator of the well and was the holder of the drilling permit issued by the Ohio Division of Oil and Gas authorizing it to drill the well. Dave Atha owns Plaintiff, D.T. Atha, Inc.
 {¶ 17} "Clermont Natural Gas Company (`Clermont'), not a party to this action, was the owner of the Krauss No. 1 Well, which was subject to the working interests of the above owners. Tom Atha owns Clermont, and served as the geologist and `company man' on the Krauss No. 1 Well.
 {¶ 18} The Operator was an investor with Clermont in the Krauss No. 1 Well by virtue of a 3% working interest. MFC was an investor in the Krauss No. 1 Well by virtue of a 50% working interest. MFC became the operator of the Krauss No. 1 Well in October 2004. Plaintiff, Greenwich is subrogated to the rights of the Operator by virtue of a $100,000.00 payment made under an insurance policy issued to the Operator.
 {¶ 19} "Brian Galford owns L S, as well as G H Drilling Co., which both own drilling rigs. G H Drilling Co. held a 6.25% working interest in the Krauss No. 1 Well.
 {¶ 20} "Defendant L S entered into an oral contract with the Operator for the drilling of the Krauss No. 1 Well. The Operator served as the agent for itself and the other working interest owners of the Krauss No. 1 Well.
 {¶ 21} "The Contract
 {¶ 22} "Prior to working on the Krauss No. 1 Well, the Operator and L S had entered into written drilling contracts on other wells. This was further evidenced by subsequent dealings and contracts on other wells. Those contracts establish a course of conduct and dealings to be followed for the drilling of the Krauss No. 1 Well. *Page 7 
 {¶ 23} "Based on course of conduct and past dealings, it was the obligation of the Operator to provide a geologist, i.e., Tom Atha, to perform mud logging and general supervision, to monitor potential gas shows and to ensure that sufficient brine was on site.
 {¶ 24} "The contract obligated L S and the Operator and its agents, i.e., Tom Atha, to act in accordance with `good drilling practice.' The contract also provided that L S was obligated to indemnify the Operator as to all claims resulting from the willful or negligent acts or omissions of L S and/or its agents or employees.
 {¶ 25} "The Permit Conditions `highly' recommend that the owner, i.e., the Operator, `maintain a sufficient supply of brine' at the well site for possible well control emergencies. The Permit Conditions also require that the BOP to be tested. Additionally, the Permit Conditions also contain an `ALERT stating that `[o]wners should prepare to encounter large volumes of high-pressure natural gas when drilling through reservoirs below the Knox Unconformity,' i.e., the Trenton Formation.
 {¶ 26} "The Krauss No. 1 Well (Chronological Facts).
 {¶ 27} "During the drilling of the Krauss No. 1 Well the drillers, rig hands and the tool pusher were employees of L S. Over a 24-hour period, two to three L S crews, with two people per crew per shift, worked on the Krauss No. 1 Well. One of the two workers was the driller, who reported to the tool pusher, who reported to the drilling superintendent and then to Galford.
 {¶ 28} "Jim McCauley was the `tool pusher,' the immediate supervisor of the drillers on the rig, and Danny Patterson was the tool pusher's boss for the Krauss No. 1 Well. McCauley and Patterson (and other unnamed L S employees) were responsible *Page 8 
for ensuring that a functioning BOP, mud pump and brine were on site, as well as ensuring that the cement job was properly performed. McCauley provided daily morning reports to Tom Atha.
 {¶ 29} "Tom Atha served as both the geologist, i.e., the `company man', and the `mud logger' for the Krauss No. 1 Well. Generally, two individuals fill these positions. As the geologist, Tom Atha was responsible for determining the target depth for the Krauss No. 1 Well, and monitoring the drilling progress to the target depth of 3,082 feet in the Trempeleau Formation. Tom Atha, as the geologist, also prepared a Well Prognosis to alert the drillers as to which formations they were approaching. The Well Prognosis delineated the various formations and the depth each should be encountered. * * *
 {¶ 30} "Tom Atha was also responsible for overseeing the drilling operations, and working with McCauley, the tool pusher, and the drillers to ensure all equipment was ready when the target depth was reached.
 {¶ 31} "The `mud log' records, in real time, the penetration rate and also monitors gas shows. The mud logger typically starts performing his duties when drilling through formations of interest begins, due to the possibility of gas and oil. The mud logger is responsible for noting formations and gas shows. Moreover, Tom Atha, as the mud logger, had the duty to ensure that brine was on site; he also had the ability to stop operations if necessary.
 {¶ 32} "Tom Atha began his duties on Saturday, September 19, 2004, just before the Trenton Formation was reached. Tom Atha went to the Krauss No. 1 Well to hook up the mudlogger, which occurred at a depth of 2,328 feet. *Page 9 
 {¶ 33} "The Daily Drilling Report (`Report') * * * and a geolograph (a piece of equipment provided by L S), were used to monitor the Krauss No. 1 Well. The drillers indicated the daily progress of the drilling and any significant events on the Report.
 {¶ 34} "The Cement Job
 {¶ 35} "When an oil well is constructed, the surface casing is cemented around the pipe to hold it in place, and to prevent oil from leaking to the surface, including the soil and fresh water systems. A rubber plug is placed in the pipe and it scours the inside of the pipe as it forces the cement down through the pipe, and up around the outside. When the plug reaches the bottom of the pipe during the cement job, it is referred to as `plug down.' L S employees indicated `plug down' on September 16, 2004, at 8:15 a.m. * * * If a problem is indicated with the plug going down, then there is a concern with using the BOP in the event of a blow out.
 {¶ 36} "It is important to have a good cement job on the surface casing for the use of the BOP, and to contain oil and other fluids and gases within the interior of the pipe to prevent them from seeping into the fresh water aquifers if the BOP is used.
 {¶ 37} "Both the Plaintiffs' and the Defendant's experts agreed that if a problem existed with the cement job, that problem would not cause a blow out, but may contribute to controlling the blowout, assuming a functional BOP was on site.
 {¶ 38} "On September 16 and 17, 2004, Tag Cement' was noted by L S employees on both the Daily Report and the Geolograph. This indicated that the drill bit was hitting cement 48 to 50 feet from the bottom, when it should have hit cement only 15 feet from the bottom.
 {¶ 39} "The Pits. *Page 10 
 {¶ 40} "When L S constructed the Krauss No. 1 Well site, two pits, the working pit and the blow pit, were excavated to retain any overflow and prevent oil from seeping offsite. The blow pit was approximately a dozer blade wide by 50 feet long by four feet deep, which is considerably smaller than standard pits in the industry. Both the blow pit and the mud pit were lined with pit liners supplied by the Operator.
 {¶ 41} "The Krauss No. 1 Well was located on farmland that had buried drainage tiles which drained into a nearby creek. The drainage system, located near and on the well site, consisted of, among others, one 12-inch tile that drained to the creek; three, four-inch perforated, plastic drain tiles, which drained into the 12-inch tile; and a four-inch clay tile, which also drained into the 12-inch tile.
 {¶ 42} "The 12-inch tile was in the working pit. One of the four-inch perforated plastic drain tiles (Lateral #1) and the four-inch clay drain tile were in the blow pit. While digging the pits, several buried drain tiles were broken, including the 12-inch, the four-inch clay tile, and Lateral #1. The employees from L S, who noticed the broken drain tiles in the blow pit attempted to plug them with plastic and dirt underneath the liner.
 {¶ 43} "Good drilling practice requires that any broken or damaged tiles caused while excavating the blow pit or the working pit be repaired and should be reported to the Operator.
 {¶ 44} "The BOP
 {¶ 45} L S, as the drilling contractor, provided and was responsible for maintaining a functional BOP onsite. In the event of a blow out, the BOP can be used to `kill' a well. Galford testified that prior to the blow out, there were no known problems with the BOP at the Krauss No. 1 Well; however only one choke line was attached to *Page 11 
the BOP and two lines should have been attached. Additionally, no evidence was presented that the BOP was inspected or tested prior to commencing drilling, as required by the Permit Conditions.
 {¶ 46} "At the time of the blow out, L S employees did not attempt to use the BOP because only one line was attached and because of the faulty cement job. Ultimately the BOP was inoperable.
 {¶ 47} "Even if the BOP was not properly functioning, a blow out can still be controlled through the use of the mud pump.
 {¶ 48} "The Mud Pump
 {¶ 49} L S owned and was responsible for the proper functioning of the mud pump at the Krauss No. 1 Well.
 {¶ 50} "The mud pump functions to pump fluid into the well and provide pressure in the event of a blow out. Without kill water on site, the mud pump cannot function.
 {¶ 51} "When Dave Atha arrived onsite after the blow out, the L S employees would not start the mud pump because they were concerned that it would create sparks and trigger a fire when combined with the oil; a conclusion with which Dave Atha concurred.
 {¶ 52} "The Brine/Kill Water
 {¶ 53} "It is within good drilling practice to maintain sufficient brine or kill water on the well site during drilling. It was the responsibility of the Operator to ensure that kill water was on the Krauss No. 1 Well site.
 {¶ 54} "Despite the fact that Tom Atha instructed McCauley to get kill water onsite, it was ultimately Tom Atha's responsibility, as an agent of the Operator, to *Page 12 
ensure that kill water was actually onsite. Nonetheless, it is the industry standard, and L S employees were aware, that sufficient brine should be maintained onsite while drilling for oil occurs.
 {¶ 55} "L S, Tom Atha, and the Operator all failed to ensure that brine was on site at the Krauss No. 1 Well at the time of the blow out. In fact, prior to the blow out, kill water was never ordered to the site by anyone. All parties had knowledge that there was no brine on site, yet continued to drill even after significant gas shows occurred.
 {¶ 56} "The Blow Out
 {¶ 57} "On September 19, 2004, the evening prior to the blow out, the mud pump was hooked up and drilling was nearing the Trenton Formation. Tom Atha expected to hit oil 16 to 18 hours after the top of the Trenton Formation (2,504 feet) was reached. The estimated target depth to hit oil was 3,082 feet in the Trempeleau Formation.
 {¶ 58} "On Sunday, September 19, 2004, Tom Atha noticed a gas show at a depth of 2,520 feet in the Trenton Formation, and made a notation on the mud log before leaving the well prior to 8:00 p.m.
 {¶ 59} "The increasing gas shows indicate a greater likelihood of striking oil. Gas shows increasing from 0 to 300 or 390 units, would be significant. The actual increase in gas units is not necessarily as important as the trend itself.
 {¶ 60} "Prior to Tom Atha leaving, Wesley Clark, the driller on the 3 p.m. to 11 p.m. shift, noticed a significant, increased gas show when he made his last pipe connection. Clark had a sample done and spoke with Tom Atha. After his conversation with Tom Atha, Clark informed Jim Riley, the driller on the next shift, to keep drilling but *Page 13 
to call Tom Atha if anything `significant' occurred. Tom Atha left the site with this knowledge and did not take any preventative steps with respect to the brine.
 {¶ 61} "Thereafter, at approximately 9:30 p.m., Clark indicated another significant gas show. And then, at 11:45 p.m., Riley noted a gas show of 325 units.
 {¶ 62} "On Monday, September 30, 2004, between 1:00 and 2:00 a.m., Riley noted a gas show of 393 units. Not long after, at approximately 3:30 a.m., a blow out occurred at the Krauss No. 1 Well. The blow out occurred at 2,756 feet in the Black River interval of the Trenton Formation, before the expected target depth of 3,082 feet.
 {¶ 63} "On Monday, September 20, 2004, at approximately 4:00 a.m,, Tom Atha received a phone call from L S informing him of the blow out. Tom Atha, Dave Atha, McCauley and Galford all arrived at the Krauss No. 1 Well site that morning.
 {¶ 64} "The two drillers onsite shut down the well, but oil continued to escape from the well into the blow pit. The oil overflowed the blow pit and pooled in the surrounding farmland. McCauley used a dozer to create a perimeter dike around the pit to prevent any more oil from flowing into the farm fields.
 {¶ 65} "When Dave Atha arrived on the site, the workers would not start the mud pump because they feared it would spark and create a fire; a conclusion concurred with by Dave Atha, as noted above. Dave Atha was also informed that the BOP could not be used because the cement job was faulty and the BOP only had one choke line attached.
 {¶ 66} "Upon the realization that both the mud pump and BOP onsite were inoperable, Producers Service Company (`Producer'), located in Zanesville, Ohio, was called and arrived onsite at approximately 10:15 a.m. Prior to Producers' arrival, kill *Page 14 
water was delivered on site by Fishburn Services (`Fishburn'), located in Morrow County, Ohio.
 {¶ 67} "Producers arrived with a working mud pump and at 11:30 a.m. began `killing' the well using only kill water. The Krauss No. 1 Well was successfully killed by 1:00 p.m. on September 20, 2004.
 {¶ 68} "Clean Up.
 {¶ 69} "After the blow out, a substantial amount of oil entered the working pit and seeped into the cracked, 12-inch drain tile. The blow pit was inadequate in size and, as a result, oil overflowed offsite into the surrounding farmland and seeped into the ground and entered the drainage system through Lateral #1 and other 4-inch tiles.
 {¶ 70} "The clean up of the Krauss No. 1 Well blow out was extensive and required excavation of the site, as well as removal and remediation of more than 17,000 tons of contaminated soil, replacement with clean soil, replacement of over one mile of drain tiles, removal of oil from a public waterway, and remediation of the public waterway to EPA standards.
 {¶ 71} "The costs of drilling and operation of the Krauss No. 1 Well, including clean up costs after a blow out, were to be borne proportionately by the working interest owners, in the proportion that they were invested in the well.
 {¶ 72} "The clean up costs total $695,037.58. Total offsite clean up costs amounted to $392,560.00, and the remainder of the clean up costs ($302,477.58) were onsite. For the clean up costs of the Krauss No. 1 Well, Tom Atha, through Clermont, paid $232,894.70; MFC paid $462,445.88; and Greenwich paid $100,000, as it is *Page 15 
subrogated against the Operator for that amount. Overall, the working interest owners were charged approximately $550,000.00 for clean up costs.
 {¶ 73} "Despite the blow out, 1,400 — 1,600 barrels of oil were recovered from the Krauss No. 1 Well. At least 285 barrels were lost due to the blow out."
 {¶ 74} As a preliminary matter, we note certain of L S's assignments of error argue the court erred as a matter of law while others argue the court's decision was against the manifest weight of the evidence. Our standard of reviewing an assertion a trial court's decision is against the manifest weight of the evidence was set forth in C.E. Morris Companyv. Foley Construction Company (1978), 54 Ohio St. 2d 279. InMorris, the Supreme Court held a judgment supported by some competent and credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence. A reviewing court may not substitute its judgment for that of the trial court. Myers v.Garson, 66 Ohio St. 3d 610, 1993-Ohio-9. By contrast, we review a court's decision on a matter of law de novo.
 I. {¶ 75} In its first assignment of error, L S argues the trial court erred in determining the working interest owners of the well in question had created a joint venture. The trial court cited Silver Oil Company v.Limbach (1989), 44 Ohio St. 3d 120 and Ford v. McCue (1955),163 Ohio St. 498, as authority for a four-factor test to be applied to determine whether a joint venture or general partnership exists: "(1) an agreement, expressed or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest among the partners in that purpose; and (4) an equal right to voice opinion in the direction of the *Page 16 
enterprise, giving rise to an equal right of control." Joint venturers are jointly liable for expenditures and costs of the venture.Ford, supra. However, the members of a joint venture need not exercise equal or the same control over the business. Kahle v. Turner (1978),66 Ohio App. 2d 49.
 {¶ 76} The trial court found the working interest of owners had an agreement, but no written instrument. The court correctly noted written documentation is not necessary when creating a joint venture, although it is required for a partnership. The court found the working interest owners owned 100% of the working interest, and all had a common purpose, i.e., to drill for oil. The working interest owners shared the profits and costs according to the proportion of the working interest held in the well. Most if not all the working interest owners were experienced and sophisticated in oil and gas ventures, and contributed to the governance of the well. The court concluded the relationship was a joint venture.
 {¶ 77} L S concedes the trial court was correct in utilizing the four-prong test, but urges the court misstated the prongs and misapplied them in making its determination. L S argues the record does not demonstrate that each of the investors in the working interest had an equal right of control to carry out the common purpose of the venture, nor does it establish they all actively participated in managing the venture. L S urges the working interest owners were investors in the well, while Clermont Oil had a fiduciary relationship to the investors in the well.
 {¶ 78} Appellee is correct in pointing out the law cited by L S arises from cases out of the State of Colorado, which are not consistent with Ohio law. The trial court correctly articulated and applied Ohio law. *Page 17 
 {¶ 79} We have reviewed the record, and we find there was sufficient, competent and credible evidence to support the trial court's findings.
 {¶ 80} The first assignment is overruled.
 II. {¶ 81} In its second assignment of error, L S argues the trial court erred in finding D.P. Atha, Inc. and MFC Drilling, Inc. were entitled to bring an action on behalf of the other members of the joint venture. L S asserts the proper plaintiffs would have been the name of the joint venture entity or in the alternative, all the members of the joint venture.
 {¶ 82} Appellee makes two responses. First, both parties cite Oda v.Davis (1992), 81 Ohio App. 3d 555, 611 N.E. 2d 933. Oda dealt with a partnership, which is not the case here. In Oda, one of the partners in a real estate partnership brought an action against a tenant for non-payment of rent. The partner brought the action in his own name and without reference to the partnership, and took a judgment against the tenant solely in his own name. The Montgomery County Court of Appeals found this especially troubling because the judgment entry did not reflect it represented an obligation payable to the partnership. In order to assert their interest in the judgment, Oda's partners would have to look beyond the face of the judgment, and also behind the face of the complaint, which did not refer to the partnership. Oda at 560.
 {¶ 83} As appellee points out, the complaint, amended complaint, and judgment entry all reflect the various parties and their interests. *Page 18 
 {¶ 84} Appellees also urge L S waived this assignment of error, because it did not raise an objection the suit was not brought by the proper party in interest pursuant to Civ. R. 17(A).
 {¶ 85} We find the trial court did not err as a matter of law in finding appellees brought the action in their representative capacities on behalf of the joint venture. Accordingly, the second assignment of error is overruled.
 III. {¶ 86} In its third assignment of error, L S argues the court erred as a matter of law in finding appellee D.T Atha, Inc. and MFC Drilling, Inc. were proper parties or the real parties in interest because D.T Atha, Inc. had not paid any of the costs associated with the cleanup, and MFC acted as a volunteer in doing so.
 {¶ 87} D.T Atha, Inc. owned 3% of the Working Interest in the well, was the operator of the well, and the holder of the drilling permit issued by the Ohio Division of Oil and Gas. MFC Drilling, D.T Atha, Inc., and Clermont were all billed for, and paid, the cleanup costs. There was testimony presented the parties paid some of the invoices because the blowout was an emergency situation that had to be addressed immediately, and ultimately, the Working Interest partners would share the expenses proportionately. In addition to being one of the joint venturers, MFC Drilling was an operator in the cleanup operations.
 {¶ 88} We conclude the record does not support L S's contention MFC Drilling was a volunteer, and does not support the conclusion D.T. Atha, Inc. and MFC did not incur any of the damages.
 {¶ 89} The third assignment of error is overruled. *Page 19 
 IV {¶ 90} In its fourth assignment of error, L S argues the trial court's determination D.T. Atha, Inc. and MFC Drilling, Inc. brought the action in a representative capacity was against the manifest weight of the evidence. L S argues the complaint and amended complaint do not reflect whether D.T. Atha, Inc. and MFC Drilling brought the action in their personal capacities or their official capacities.
 {¶ 91} Our review of the record leads us to conclude there was sufficient competent and credible evidence presented to the trial court from which it could determine these parties had brought the action in their representative capacities.
 {¶ 92} The fourth assignment of error is overruled.
 V. VI. {¶ 93} In its fifth assignment of error, L S argues the court committed reversible error when it applied a negligence standard to the parties' conduct when their relationship was contractual in nature. L S cites us to Proctor Gamble Company v. Bankers Trust Company
(S.D. Ohio 1996), 925 F. Sup. 1270, which held if the parties' relationship is contractual a negligence claim is redundant. In its sixth assignment of error L S asserts the court erred in applying the principles of comparative negligence.
 {¶ 94} The contract between the parties refers specifically to negligence acts. It provides that L S was obligated to indemnify the Operator as to all claims resulting from the willful or negligent acts or omissions of L S and/or its agents or employees. Additionally, appellees point out L S raised the defense of comparative negligence and assumption of the risk in its answer to the complaint. *Page 20 
 {¶ 95} Very frequently, breach of contract actions are grounded in claims of negligent performance of contractual duties by one or both parties. Here, the trial court found the various parties were comparatively negligent, and assessed how each one's negligence contributed to the accident and the subsequent cleanup costs.
 {¶ 96} In Floor Craft Floor Covering, Inc. v. Parma Community GeneralHospital Association (1990), 54 Ohio St. 3d 1, 560 N.E. 2d 206, the Ohio Supreme Court discussed, inter alia, the distinctions between contract and tort recovery. The Supreme Court quoted the Supreme Court of Virginia in finding tort law offers remedies for losses suffered by reason of some duty imposed by law to protect the broad interest of social policy. Tort law does not compensate parties for losses suffered as a result of breach of duties assumed only by agreement. A claim for breach of contractual duties necessitates an analysis of the damages within the contemplation of the parties when entering into the agreement, and should be analyzed according to the law of contracts. The controlling policy consideration underlying tort law is the safety of persons and property from losses resulting from injury, while the controlling public policy consideration underlying the law of contracts is a protection of expectations bargained for Floor Craft, at 7 citations deleted.
 {¶ 97} Here, the parties' failure to perform their contractual duties properly proximately caused not only economic damages arising from the contract, but also property damages recoverable in tort.
 {¶ 98} The fifth and sixth assignments of error are overruled. *Page 21 
 VII {¶ 99} In its seventh assignment of error, L S urges the court erred as a matter of law in finding L S was liable for costs incurred onsite and offsite pollution cleanup despite the fact it found both L S and D.T. Atha, Inc. had each breached the contract. L S urges it could only be held liable for breach of contract if D.T. Atha, Inc. had substantially performed its obligations under the contract.
 {¶ 100} Appellees assert L S waived the error by failing to raise the issue at the trial court level.
 {¶ 101} The trial court determined appellee D.T. Atha, Inc. was 35% comparatively negligent for the onsite damages and costs to the breach of contract in failing to maintain brine on site, while defendant L S was 65% negligent for the onsite damages and costs. It appears clear the trial court found appellee had performed its contractual duties more substantially than L S, and we have found the court's use of a comparative negligence standard was proper, V and VI supra.
 {¶ 102} The seventh assignment of error is overruled.
 VIII {¶ 103} L S urges the trial court's determination its conduct was the proximate cause of the oil seeping offsite was against the manifest weight of the evidence.
 {¶ 104} L S argues the blowout caused oil to escape from the well into the blow pit and pool out onto surrounding farmland, where it seeped into the ground and entered at the drainage system serving the farmland. The perforated tiles ultimately emptied into the Little Walnut Creek. L S admits it damaged some of the tiles, but urges appellee MFC also damaged the tile system during its cleanup operation. The trial court *Page 22 
specifically found appellee D.T. Atha, Inc. had failed to have kill water onsite in a timely manner, and had it done so, no oil would have escaped offsite.
 {¶ 105} L S urges these factor, independently or together could have proximately caused the oil seepage offsite, and there was insufficient evidence before the trial court for it to conclude L S was responsible for offsite oil damage.
 {¶ 106} We have reviewed the record, and we find there was sufficient, competent and credible evidence presented to the trial court from which it could conclude L S was responsible for the offsite pollution cleanup costs. Accordingly, the either assignment of error is overruled.
 IX {¶ 107} In its ninth assignment of error, L S argues the court erred as a matter of law in finding appellee Greenwich Insurance Company is entitled to 100% reimbursement as the subrogated insurer for appellee D.T. Atha, Inc. L S arguments presume the arguments in the second, third, and fourth assignments of error, namely, that D.T. Atha, Inc. was not entitled to recover damages in this case. Because we find appellee D.T. Atha, Inc. was entitled to recover damages, it follows its subrogated insurer is also entitled to recovery.
 {¶ 108} The ninth assignment of error is overruled. *Page 23 
 {¶ 109} For the foregoing reasons, the judgment of the Court of Common Pleas of Delaware County, Ohio, is affirmed.
 By Gwin, J., Hoffman, P.J., and Wise, J., concur *Page 24 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Delaware County, Ohio, is affirmed. Costs to appellant. *Page 1