OPINION *Page 2 
{¶ 1} Defendant-appellant James G. Shockey appeals the Judgment Entry of the Delaware County Court of Common Pleas granting a civil stalking protection order in favor of Plaintiff-appellee Kimberly Shockey.
 STATEMENT OF THE FACTS AND CASE {¶ 2} The parties were married on July 24, 1999, and two children were born of the marriage. On June 28, 2007, the parties were divorced in the Delaware County Court of Common Pleas. On several occasions, the parties attempted to reconcile their marriage following their divorce. Appellant cites the evening of October 31, 2007, during which the parties participated in trick-or-treat activities with their children, and later engaged in sexual intimacy. Appellant further maintains the parties engaged in sexual intimacy during the time pending between the filing of the petition in this matter and the granting of the protection order on February 20, 2008.
 {¶ 3} Appellee testified at the hearing in this matter Appellant regularly harassed her at work, and there were numerous arguments during the exchange of children. Appellee stated Appellant would come to the house, bang on the door, ring the doorbell, and not remove his foot from the door. On several occasions, Appellee called 911 and the police responded to the situation.
 {¶ 4} On November 4, 2007, Appellee was at the home of John Yekel, while Appellant had the parties' minor children and Appellee's child from a previous relationship, Jonah. During the course of the evening, Appellant went to Yekel's residence and spied in the back windows. He later returned to Yekel's residence with Jonah, and began pounding on the door, shouting obscenities. A fight then ensued *Page 3 
between Yekel and Appellant. Appellant was subsequently criminally charged for the conduct.
 {¶ 5} On November 5, 2007, Appellee filed a petition for a civil stalking or sexually oriented offense protection order in the Delaware County Court of Common Pleas. On November 6, 2007, the trial court granted the motion ex parte, and scheduled the matter for full hearing on February 4, 2008. On February 20, 2008, the trial court magistrate granted Appellee's motion.
 {¶ 6} On March 5, 2008, Appellant filed objections to the magistrate's decision. Via Judgment Entry of June 11, 2008, the trial court upheld the granting of the order. Appellant now appeals, assigning as error:
 {¶ 7} "I. THE TRIAL COURT ERRED IN GRANTING THE PETITION FOR CIVIL STALKING OR SEXUALLY ORIENTED OFFENSE PROTECTION ORDER AS SUCH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AN ABUSE OF THE TRIAL COURT'S DISCRETION."
 {¶ 8} The decision whether to grant a civil protection order lies within the sound discretion of the trial court. Olenik v. Huff, Ashland App. No. 02-COA-058, 2003-Ohio-4621, at ¶ 21. Therefore, an appellate court should not reverse the decision of the trial court absent an abuse of discretion. In order to find an abuse of discretion, this court must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 9} We further note that a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the *Page 4 
evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, 280, 376 N.E.2d 578. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson, 66 Ohio St.3d 610, 1993-Ohio-9,614 N.E.2d 742. The underlying rationale for giving deference to the findings of the trial court rests with the knowledge the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. City of Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 10} Ohio Revised Code Section 2903.214 governs the issuance of civil protection orders. The statute reads, in pertinent part:
 {¶ 11} "(C) A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court. The petition shall contain or state both of the following:
 {¶ 12} "(1) An allegation that the respondent engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order or committed a sexually oriented offense against the person to be protected by the protection order, including a description of the nature and extent of the violation;"
 {¶ 13} Ohio Revised Code Section 2903.211 defines menacing by stalking:
 {¶ 14} "(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.;" *Page 5 
 {¶ 15} In order to obtain relief under R.C. 2903.214 a petitioner must establish by a preponderance of the evidence a violation of R.C. 2903.211. Felton v. Felton (1997), 79 Ohio St.3d 34.
 {¶ 16} Section 2903.211(D)(1) defines "pattern of conduct" as:
 {¶ 17} (D) As used in this section:
 {¶ 18} "(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents. Actions or incidents that prevent, obstruct, or delay the performance by a public official, firefighter, rescuer, emergency medical services person, or emergency facility person of any authorized act within the public official's, firefighter's, rescuer's, emergency medical services person's, or emergency facility person's official capacity, or the posting of messages or receipt of information or data through the use of an electronic method of remotely transferring information, including, but not limited to, a computer, computer network, computer program, computer system, or telecommunications device, may constitute a "pattern of conduct."
 {¶ 19} The definition requires only two or more actions closely related in time, which may occur on the same day provided there is a sufficient interval between them. State v. Scruggs (2000),136 Ohio App.3d 631. Trial courts may take every action into consideration, even if some actions in isolation would not seem particularly threatening.Guthrie v. Long, 2005-Ohio-1541; Miller v. Francisco, 2003-Ohio-1978.
 {¶ 20} We disagree with Appellant the trial court is limited to only considering evidence relative to conduct occurring prior to the filing of the petition for the civil protection order. Rather, we find the legislative purpose best served by not restricting *Page 6 
the trial court from considering relevant evidence occurring after the petition has been filed but prior to the full hearing on the petition.
 {¶ 21} Upon review of the record, Appellee described confrontations in the exchange of their children for visitation, including:
 {¶ 22} "Q. Tell the court a little bit about the problems that have existed at the time of the pick-up of the children when they are at the house or when they were at the house.
 {¶ 23} "A. Well, he always puts his foot in the door so I can't close the door. There's probably been at least three or four times that I've had to call Genoa police. Again, he's not even supposed to be in my driveway but he finds some reason to have to talk to me, put the foot in the door and I'm trying to close the door and, you know, he's calling me names in front of the children.
 {¶ 24} "Q. What does your husband do for a living?
 {¶ 25} "A. He works for the City of Columbus, he's a detective. He's supposed to protect children, he's in the juvenile sexual assault squad."
 {¶ 26} Tr. at 13.
 {¶ 27} Appellee further testified as to the November 4, 2007 incident:
 {¶ 28} "Q. Let's talk a little bit about the incident that gave rise to the second filing or this filing. Was there an incident that occurred in November of 2007?
 {¶ 29} "A. Yes, there was.
 {¶ 30} "Q. Why don't you tell the court about that?
 {¶ 31} "A. I was at a friend's house watching football. My car was in his garage. I had just spoken to Jay and the children that evening probably about seven o'clock. I *Page 7 
called my kids at seven o'clock that evening, at that time I was at my mother's, told them good night. It was probably about ten o'clock that evening my cell phone starts ringing and it was restricted and I knew it was probably Jay. I did not answer that phone. I was actually upstairs in the restroom and the phone keeps ringing and keeps ringing. And my friend John, whose home I was at, noticed that his security light went on off the front of his house, so he turned off all the lights and looked out and he couldn't see anything and he came upstairs. I'm like my phone's ringing, I think it's Jay. All of a sudden there is pounding and not just pounding, beating so loud that I thought the windows were going to break and him, it was Jay outside of John's house screaming for me to come out, so I called 911.
 {¶ 32} "Q. Now let me interrupt you for a minute. At this time did he have the children?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. Or was he supposed to have the children?
 {¶ 35} "A. Yes. He had visitation of the children, including Jonah.
 {¶ 36} "Q. And tell the court again who Jonah is.
 {¶ 37} "A. Jonah is my son by a previous marriage. Jay has been in Jonah's life since he was nine years old.
 {¶ 38} "Jay and I came to an agreement, because he had always at that time treated Jonah like his own, that Jonah could go on visitation on Sunday and Mondays, so the kids were supposed to be with him that evening.
 {¶ 39} "Q. So when you heard this beating on the door, what, what did you do?
 {¶ 40} "A. Called 911. *Page 8 
 {¶ 41} "Q. Okay. And did you go out and have a confrontation with your husband?
 {¶ 42} "A. Not at that time.
 {¶ 43} "* * *
 {¶ 44} "A. Okay. So I called 911 because the beating was so loud and of course he was down there screaming profanity for me to come out.
 {¶ 45} "Q. What was he saying?
 {¶ 46} "A. That the, I don't know, I could just hear him screaming and my cell phone was still ringing and I was talking to the 911 operator and they told me not to go out.
 {¶ 47} "Q. Okay. So what happened then?
 {¶ 48} "A. John's looking out the window and he said he sees that Jay pulls Jonah out of his car.
 {¶ 49} "Q. Now wait a minute, what time was this?
 {¶ 50} "A. This was probably about 10:15, 10:30 by this, I don't know, between 10:00 and 10:30 on Sunday evening.
 {¶ 51} "Q. Okay. And he pulled Jonah out of your car?
 {¶ 52} "A. No. Out of his back seat.
 {¶ 53} "Mr. Butler: Objection. She just reported I think what someone else saw. She said John saw, she didn't say she saw.
 {¶ 54} "The Court: I'll overrule that for the moment.
 {¶ 55} "By Mr. Heald:
 {¶ 56} "Q. But it was his car not your car? *Page 9 
 {¶ 57} "A. It was Jay's car that was parked down hiding from John's house. It wasn't in front of John's house.
 {¶ 58} "Q. Okay. Did, whether you initially saw Jonah or not, did you ultimately see Jonah?
 {¶ 59} "A. Yes, I did. That's what made me go outside.
 {¶ 60} "Q. Okay. What happened?
 {¶ 61} "A. I saw, I looked out the window and I saw him with his hands around my son, he had him pulling him around.
 {¶ 62} "Q. And how old is Jonah?
 {¶ 63} "A. He was 12 at the time.
 {¶ 64} "Q. Okay. And did, was there any effort by Jonah to contact you?
 {¶ 65} "A. Yes. I have a voice mail that Jay made Jonah call me on my voice mail, it says please answer the door or I'm going to children services.
 {¶ 66} "Q. And did you then answer the door?
 {¶ 67} "A. Oh, yes. I saw him with my son pulling him around by the neck. 911 told me not to go out but he's my son, I'm his mother and I had to go help him.
 {¶ 68} "Q. And at that time were you scared?
 {¶ 69} "A. I was scared to death.
 {¶ 70} "Q. Was there any discussion with you and your husband that he was going to return Jonah or anybody else to you that night?
 {¶ 71} "A. No.
 {¶ 72} "Q. Were the other children in the car?
 {¶ 73} "A. No. He left them home with his mother. *Page 10 
 {¶ 74} "Q. Was there — okay. What happened then?
 {¶ 75} "A. I went outside to get Jonah. Jay comes charging towards me. John, who owns the house, stepped in front of me and Jay charged him instead and they started wrestling around and fighting.
 {¶ 76} "Q. Did the police ultimately get there?
 {¶ 77} "A. Yes.
 {¶ 78} "Q. Okay. And were you ever struck at that time?
 {¶ 79} "A. No.
 {¶ 80} "Q. How did that incident make you feel about your safety?
 {¶ 81} "A. I was scared to death."
 {¶ 82} Tr. at 13-18.
 {¶ 83} Again, Appellee testified on numerous occasions she called 911 and the police responded to her residence due to Appellant's refusal to leave the premises. She stated he would bang on the door, ring the doorbell and put his foot in the door to prevent the door from closing. Appellant testified at trial with regard thereto:
 {¶ 84} "Q. Has your wife had to call 911 because you tried to prevent her form closing the door at the residence?
 {¶ 85} "A. Yes.
 {¶ 86} "Q. And has that happened on more than one occasion?
 {¶ 87} "A. Yes.
 {¶ 88} "Q. And are you, you certainly I assume aren't claiming that you misinterpreted or didn't understand the fact that you were to stay out of the marital residence completely? *Page 11 
 {¶ 89} "A. Correct.
 {¶ 90} "Q. Now you said that there was this new incident somewhere around the 20th of January, that's not correct, is it?
 {¶ 91} "A. What do you mean?
 {¶ 92} "Q. Isn't it a fact that that happened last week on the 31st of January?
 {¶ 93} "A. It could possibly be the 31st.
 {¶ 94} "Q. And you're telling the court that on no occasions other than that was there any, have there been any confrontations; is that your testimony?
 {¶ 95} "A. What's your definition of confrontation?
 {¶ 96} "Q. Argument, loud talking, threats, foot in the door, your choice.
 {¶ 97} "A. Are we talking — here's where you're confusing me and I apologize, are we talking about at Kim's work or at the house?
 {¶ 98} "Q. Both.
 {¶ 99} "A. I'm sorry, can you repeat the question now?
 {¶ 100} "Q. Sure. At any time after November 4th, 2007 — —
 {¶ 101} "A. Have there been confrontations? Yes.
 {¶ 102} "Q. And on multiple of those occasions has your wife ended up calling 911?
 {¶ 103} "A. Yes."
 {¶ 104} Tr. at 70-72.
 {¶ 105} Again, we will not substitute our judgment for that of the trial court. The trial court is in the best position to weigh the evidence and judge the credibility of the witnesses. Upon review of the evidence, the trial court did not abuse its discretion in *Page 12 
issuing the protection order, and the judgment of the Delaware County Court of Common Pleas is affirmed.
 Hoffman, P.J. Gwin, J. and Wise, J. concur *Page 13 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Delaware County Court of Common Pleas is affirmed. Costs assessed to Appellant. *Page 1